UNITED STATES of America, Plaintiff–Appellee,

v.

Thomas Elbert CASHWELL, Defendant–Appellant.

No. 90–5214.

United States Court of Appeals, Eleventh Circuit.

Jan. 9, 1992.

36. *Rowley,* 458 U.S. at 208, 102 S.Ct. at 3052.

Benedict P. Kuehne, Sonnett, Sale & Kuehne, Miami, Fla., for defendant-appellant.

Guy A. Lewis, Linda Collins Hertz, Dawn Bowen, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before HATCHETT and EDMONDSON, Circuit Judges, and HILL, Senior Circuit Judge.

HATCHETT, Circuit Judge:

In this case, we hold that the reconstructed record of the *voir dire* proceedings was adequate to accord effective appellate review and sufficient to enable the appellant to identify possible error and formulate appropriate arguments for this court's consideration.

## I. FACTS

In mid-May, 1989, Thomas Cashwell, the appellant, chartered a 1978 forty-four foot sailing vessel, the "Irgendwo," from a marina in Plantation Key, Florida. The charter company checked the vessel for seaworthiness before releasing it to Cashwell.

When Cashwell failed to return the "Irgendwo" before the charter expiration date of May 27, the charter company owner contacted the U.S. Coast Guard and reported the vessel overdue. The Coast Guard promptly issued a report of the overdue vessel on channel 16, the international distress channel. Around noon on June 11, the pilot of a Coast Guard airplane, flying routine patrol in the Caribbean, observed a white sailboat in the water south of Cuba, with a woman sunbathing on the deck and a man standing near her. Although the vessel was dead in the water with no sails, the pilot concluded that it was not disabled because neither person signaled the air-

plane nor broadcasted a distress signal over channel 16. Although the pilot determined that the boat was a pleasure craft which was not in any way suspicious, he nevertheless notified the Coast Guard Cutter "Dauntless," which was patrolling near the siting of the vessel's location.

After receiving the radio report, the "Dauntless's" commanding officer decided to proceed in the direction of the "Irgendwo." While en route, the "Dauntless" encountered the "Horizonte," a thirty-five foot cabin cruiser. The Coast Guard personnel boarded the "Horizonte" and found 200 large rectangular bales of marijuana each weighing 70 pounds. The Coast Guard personnel arrested the five people on board, and seized the vessel. Two Coast Guard officers took custody of the "Horizonte," while Coast Guard Seaman Boyette maintained a position behind the "Horizonte" in a small boat, to see whether anyone or anything fell overboard. At about 5:45 p.m. during the final stages of the seizure of the "Horizonte," the "Dauntless" received a distress call relayed from a merchant vessel reporting that an unidentified sailboat had engine problems and a blown-out sail. The crew of the "Dauntless" determined that since the nature of the reported problems did not pose any danger to life, no immediate need to effect a rescue operation existed. The crew of the "Dauntless" decided to secure the "Horizonte" before proceeding in the direction of the sailboat, but requested the assistance of the merchant vessel to establish periodic communication with the sailboat and relay messages to the "Dauntless." Additionally, "Dauntless" crew requested that the merchant vessel advise the sailboat's crew that the Coast Guard would assist them later.

At 6:15 p.m., the "Dauntless" received a message that the sailboat's bilge pump had failed and it was taking on water. Since the situation was now life threatening, the "Dauntless" immediately took a course toward the sailboat. The "Horizonte" followed the "Dauntless" with Seaman Boyette following the "Horizonte" in a small boat. When the "Dauntless" arrived at the scene at approximately 8 p.m., the mer-

chant vessel was already at the sailboat's location. The merchant vessel was stopped in the water, shining a light beam on a raft which contained Cashwell, and two women. The sailboat, which was the "Irgendwo," had already sunk four feet with only its cabin and mast visible. Although "Dauntless" crew members connected pumps to the "Irgendwo," it sank as the three people from the raft were rescued.

The "Irgendwo" sank before the "Horizonte" and Seaman Boyette arrived. While waiting beside the "Dauntless" for instructions, Seaman Boyette noticed several items floating in the water: two bales of marijuana, a sailboat cushion, soap bottles, suntan lotion bottles, and water jugs. The two bales of marijuana weighed between twenty-five and thirty pounds, were wrapped in clear plastic, and then rewrapped. The bales were slightly wet but not soaked, and the marijuana inside was dry.

Cashwell and the two women were taken separately to Lieutenant Justice's stateroom for a routine search and rescue debriefing. Justice was interested in the circumstances of the boat's sinking because the weather conditions were not rough, nothing was in the area which could have hit the vessel, and when observed earlier in the day it had no apparent problems. Additionally, Cashwell had first reported only engine and sail problems before his report that the vessel was sinking. Cashwell told Justice that bilge pump problems caused the vessel to sink. During Justice's conversation with Cashwell, the commanding officer arrived carrying the seat cushion Boyette had found in the water. When Cashwell identified it as a cushion from his vessel, the officer placed Cashwell under arrest.

The bales of marijuana, the cushion from the boat, and the clothing of Cashwell and his companions were seized and delivered to an agent for the Drug Enforcement Administration (DEA). The bales were laboratory tested and found to consist of twenty-seven kilograms of marijuana. The government laboratory did not conduct a test on the clothing because the residue on

the clothing was insufficient for testing purposes.

## II. PROCEDURAL HISTORY

A federal grand jury in the Southern District of Florida indicted Cashwell for the knowing possession of at least twenty-five kilograms of marijuana with intent to distribute on a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C.App. § 1903(a) and 18 U.S.C. § 2. At trial, in accordance with the district court's usual practice when trying cases in Key West, the court reporter did not record the jury voir dire.[1] The jury convicted Cashwell, and the district court sentenced him to twenty-eight months imprisonment and a three-year term of supervised release. Additionally, the district court ordered Cashwell to make restitution to the owner of the "Irgendwo," in the amount of $10,441.39 and Lloyd's of London in the amount of $99,200.

Cashwell's appellate counsel, who was not trial counsel, sought and obtained an order from this court remanding the case to the district court for the limited purpose of permitting the parties to reconstruct the voir dire proceedings. The district court conducted a reconstruction hearing at which the following persons recorded their recollections of the jury voir dire proceeding: Cashwell, Cashwell's trial lawyer, the judge's court reporter, the judge's courtroom deputy, the government's trial lawyer, and the judge. To everyone's recollection, the jury selection process was routine and uneventful. Additionally, the district court certified several documents to this court which are relevant to the voir dire proceeding and consist of the judge's diary notations for the month of August, 1989; records of jury selection in cases which preceded Cashwell's case; and attendance records for the entire venire pool for the twenty-day trial calendar.

Neither Cashwell nor his trial lawyer recalled having stipulated to the nonrecordation of the voir dire proceeding, nor did they recall having waived the right to the presence of a court reporter. The trial lawyer, however, did recall having voiced to the trial judge a concern about the makeup of the jury venire. His concern was that the venire consisted of jurors rejected from prior jury selections during the court's August calendar in Key West. The trial judge remarked that the trial lawyer would have to live with the panel. The trial lawyer never moved to have the panel stricken or to preserve his objection to the panel. The discussion of the jury appears to have been mere conversation.

Jury selection occurred on August 16, 1989. Cashwell's case was the third of five cases tried during the court's twenty-day trial calendar. At the reconstruction hearing, no one could recall the racial, ethnic, or religious makeup of the venire.

## III. ISSUES

On appeal, Cashwell raises the following issues: (1) whether Cashwell's conviction must be vacated due to the unavailability of a transcript of the voir dire, (2) whether sufficient evidence supports Cashwell's conviction; (3) whether the district court violated Federal Rule of Evidence 404(b) in admitting evidence of uncharged criminal conduct relating to the sinking of the "Irgendwo"; (4) whether the district court erred in permitting a government witness to state his opinion that Cashwell purposely scuttled the chartered vessel; and (5) whether the district court properly permitted the government to elicit testimony from a DEA agent concerning the results of a field test conducted the day of trial without prior disclosure to the defense.

## IV. CONTENTIONS

Cashwell contends that the record does not foreclose the possibility that error oc-

---

1. Due to a shortage of courtroom personnel, the district judge did not require the court reporter to attend or report the voir dire proceedings if all counsel consented to that procedure. Rather, the district judge permitted the court reporter to go to a nearby office which was equipped with a speaker system so that she could hear the courtroom proceedings. In the event a problem arose, or if any counsel made any objection or wanted to place any matter on the record, or if anything unusual occurred, the judge would notify the court reporter through a "buzzer" system and she would return to the courtroom to record the proceedings.

curred, and the reconstructed portion of the trial is not adequate to afford effective appellate review. The government contends that the reconstructed nonverbatim record which contains no substantial or significant omissions is adequate and does not mandate reversal of the conviction.

## V. DISCUSSION

Cashwell contends that due to the absence of a transcript of his *voir dire* proceedings and the inability of the court to adequately reconstruct those proceedings, he has been denied a meaningful direct appeal, and thus deprived of his right to due process. In particular, Cashwell contends that the court reporter's failure to transcribe the *voir dire* proceedings in accordance with the Court Reporter Act, 28 U.S.C. § 753, constituted a substantial and significant omission which precludes him from being able to demonstrate possible errors and mandates that his conviction be vacated.

■■■ Section 753(b) of the Court Reporter Act requires that a reporter "shall record verbatim by shorthand or by mechanical means ... (1) all proceedings in criminal cases had in open court." 28 U.S.C. § 753(b). This rule is mandatory and supplants any inconsistent local court practice. *See United States v. Taylor,* 607 F.2d 153, 154 (5th Cir.1979). A criminal defendant has a right to a record on appeal which includes a complete transcript of the proceedings at trial. *Hardy v. United States,* 375 U.S. 277, 84 S.Ct. 424, 11 L.Ed.2d 331 (1964); *United States v. Stefan,* 784 F.2d 1093, 1102 (11th Cir.), *cert. denied,* 479 U.S. 1009, 107 S.Ct. 650, 93 L.Ed.2d 706 (1986). We reiterate any departure from the requirements of the Court Reporter Act is not condoned. Neverthe-

less, "a merely technically incomplete record, involving no substantial or significant omissions, will not be sufficient to work a reversal." *United States v. Selva,* 559 F.2d 1303, 1306 n. 5 (5th Cir.1977); *see also Stefan,* 784 F.2d at 1102 (insignificant omissions do not require reversal).

■■■ The lack of a verbatim transcript does not constitute a substantial or significant omission nor a constitutional defect when a suitable alternative is provided. *See Mayer v. City of Chicago,* 404 U.S. 189, 194, 92 S.Ct. 410, 414–15, 30 L.Ed.2d 372 (1971); *Harris v. Estelle,* 583 F.2d 775, 777 (5th Cir.1978); *Morgan v. Massey,* 526 F.2d 347, 348 (5th Cir.), *cert. denied,* 429 U.S. 1002, 97 S.Ct. 533, 50 L.Ed.2d 613 (1976). The Supreme Court stated in *Mayer* that

> alternative methods of reporting trial proceedings are permissible if they place before the appellate court an equivalent report of the events at trial from which the appellant's contentions arise. A statement of facts agreed to by both sides, a full narrative statement based perhaps on the trial judge's minutes taken during trial, or on the court reporter's untranscribed notes, or a bystander's bill of exceptions might all be adequate substitutes, equally as good as a transcript.

*Mayer,* 404 U.S. at 194, 92 S.Ct. at 414–15. A reconstructed record, as opposed to a verbatim transcript, can accord effective appellate review, particularly where appellate rules have established a procedure for reconstruction of the trial record. *See Morgan,* 526 F.2d at 348. Federal Rule of Appellate Procedure 10(e) provides a procedure for reconstruction of the trial record.[2] This court held in *United States v. Preciado–Cordobas,* 923 F.2d 159 (11th Cir.1991) that the holding in *Selva,* which requires the reversal of a conviction when a sub-

---

**2.** Federal Rule of Appellate Procedure 10(e) states:

If any difference arises as to whether the record truly discloses what occurred in the district court, the difference shall be submitted to and settled by that court and the record made to conform to the truth. If anything material to either party is omitted from the record by error or accident or is misstated therein, the parties by stipulation, or the dis-

trict court, either before or after the record is transmitted to the court of appeals, or the court of appeals on proper suggestion or of its own initiative, may direct that the omission or misstatement be corrected, and if necessary, that a supplemental record be certified and transmitted. All other questions as to the form and content of the record shall be presented to the court of appeals.

Fed.R.App.P. 10(e).

stantial and significant portion of the record is missing and new counsel represents the appellant on appeal was premised upon the district court's inability to reconstruct the record. *Preciado–Cordobas,* 923 F.2d at 160. Thus, substantial and significant omissions from the verbatim transcript do not mandate a reversal if a suitable alternative method of reporting trial proceedings is provided or the record can be adequately reconstructed to accord effective appellate review. *See Preciado–Cordobas,* 923 F.2d at 160 (recognizing that a reversal for transcript omissions is appropriate when the record cannot be adequately reconstructed); *Harris,* 583 F.2d at 777 (holding that a suitable alternative method of reporting trial proceedings can replace a verbatim transcript); *Morgan,* 526 F.2d at 348 (holding that a reconstructed record can accord effective appellate review).

■ In this case, the district court's failure to require the recording of the *voir dire* proceedings will mandate a reversal only if the absence of this proceeding is a substantial and significant omission from the record which cannot be adequately reconstructed. *See Preciado–Cordobas,* 923 F.2d at 160. Although the court-ordered reconstruction proceeding did not result in a verbatim account or a formal narrative of the *voir dire,* the testimony, recollections, and relevant jury selection records when collated present a fair and accurate picture of what transpired during that phase of the trial. The certified jury selection records indicate the number of people summoned for jury duty during the district court's Key West August, 1989, trial calendar. Additionally, the records indicate the identity of the jurors and their attendance record during the trial calendar. The records also confirm the trial judge's recollection that three juries were selected during the week of August 14, 1989, with Cashwell's jury being the third chosen that week. The records also identify each juror summoned for each of the three cases and disclose the disposition of each potential juror, i.e., excused for cause; excused by defense peremptory challenge; excused by government peremptory challenge; selected as a juror; selected as an alternate juror; or not drawn from the wheel. Thus, the reconstructed record was adequate for Cashwell to challenge in this court the venire in his case on the basis of prior jury service.

■ Additionally, Cashwell's contention that the record is inadequate to determine whether the jury selection in his case violated the principles enunciated in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) and *Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) is without merit. In *United States v. Rodriguez,* 917 F.2d 1286 (11th Cir.1990), this court recognized that the Supreme Court's *Batson* analysis envisioned a "timely objection" and thus held that "an inquiry into the government's exercise of its peremptory challenges is initiated by a defendant's timely objection." *Rodriguez,* 917 F.2d at 1288 n. 4. The failure to make a timely *Batson* objection results in a waiver of the claim. *See Rodriguez,* 917 F.2d at 1288 n. 4; *United States v. Romero–Reyna,* 867 F.2d 834, 836 (5th Cir.1989); *Government of Virgin Islands v. Forte,* 806 F.2d 73, 75–76 (3d Cir.1986).

In this case, the reconstructed record establishes that Cashwell's trial lawyer made no objections of any kind during *voir dire.* The testimony of Cashwell's trial lawyer at the reconstruction hearing and the testimony of the court reporter, who testified that she would have been recalled to the courtroom had any objection or motion been made, confirmed the fact that no objections were made. Since a *Batson* claim is inextricably tied to a defense counsel's "timely objection," Cashwell is in no worse a position with respect to a potential *Batson* claim than any appellant is in a case where trial counsel fails to make a timely *Batson* objection. Thus, any inadequacy in this case with respect to a potential *Batson* claim is the direct result of defense counsel's failure to object and not the result of the nonrecordation of the *voir dire* proceedings. We have reviewed all other claimed errors and find each of them to be without merit.

## V. CONCLUSION

Accordingly, the convictions and judgments are affirmed.

AFFIRMED.