[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
December 3, 2002
THOMAS K. KAHN
CLERK

_____

No. 01-12498

_____

D. C. Docket No. 00-00485-CR-UUB

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MCGHEE CHARLES,
a.k.a.
Charles McGee,
ROUSSLY ELLIASSAINT,
JOSEPH SAMPSON AUGUSTE,
YVES HERARD,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

**(December 3, 2002)**

Before TJOFLAT and BARKETT, Circuit Judges, and WEINER[*], District Judge.

PER CURIAM:

---

[*] Honorable Charles R. Weiner, U.S. District Judge for the Eastern District of Pennsylvania, sitting by designation.

McGhee Charles ("Charles"), Roussly Elliassaint ("Elliassaint"), Yves Herard ("Herard"), and Joseph Auguste ("Auguste") appeal their convictions for conspiracy to possess with the intent to distribute cocaine in violation of 21 U.S.C. §§ 846 and 841 and conspiracy to use and carry a firearm in furtherance of this offense in violation of 18 U.S.C. § 924(c) and (o). Charles and Herard also appeal their convictions for using and carrying a firearm in the commission of a drug offense in violation of 18 U.S.C. § 924(c)(1) and (2).

The appellants challenge their convictions and sentences on various bases. We affirm Charles, Herard, and Auguste's convictions and sentences. But because the evidence was insufficient to show Elliassaint knew that the conspiracy involved drugs, we reverse his conviction.

## BACKGROUND

The string of events that eventually led to the convictions of Charles, Elliassaint, Herard, and Auguste began on December 1, 1999, with the arrest of the government's confidential informant ("CI") Joacel Dorelus for his participation in a home invasion drug robbery. After initially contesting the charges against him, Dorelus later decided to cooperate with the government. Dorelus agreed to plead guilty to the charges stemming from his arrest in return for a plea agreement.

2

Under Dorelus's plea, the government agreed to recommend that he receive a three point reduction in his sentence under the Federal Sentencing Guidelines. In addition, the government agreed to lower the cost of his bond so that he could leave federal custody and assist in future investigations of home invasion drug thefts.

In May 2000, Dorelus encountered a former high school friend, Richard,[1] who proposed that the two engage in a home invasion robbery. Richard indicated he was associated with a group of individuals who executed such thefts. Dorelus reported this conversation to the Federal Bureau of Investigation (FBI). The FBI instructed Dorelus to reestablish contact with Richard and attempt to identify Richard's associates.

On June 1, 2000, Dorelus arranged to meet with Richard and told him that he was "ready to meet [his] boys." Later that day, Dorelus met with Richard in Dorelus's car while wearing a concealed FBI tape recording device. Richard provided Dorelus directions to where his friend Herard could be found and the two proceeded to that location so Richard could introduce Herard to Dorelus. After Herard entered the car, he explained to Dorelus and Richard that he was involved with a group of individuals who were in need of money. Herard further stated that

---

[1]Richard is not a party to this case.

he and his associates would be willing to burglarize a home for the purpose of stealing drugs. To convince Dorelus and Richard of his experience in this arena, Herard recounted previous drug invasions in which he had participated and showed Dorelus a nine-millimeter pistol with a silencer.

The FBI instructed Dorelus to set up a meeting with Herard and his associates on June 7, 2000 at a hotel "war room" to plan the home invasion. The FBI had previously installed a hidden video camera in the room. At an initial meeting in this war room, Dorelus purchased a shotgun from Herard. Subsequent meetings in the hotel room involved Herard and his associates. All parties except Dorelus, who remained in the room throughout, entered and exited the room periodically.

The FBI preselected an abandoned house as the location of the home invasion drug robbery and installed video surveillance equipment therein. The FBI had instructed Dorelus to tell Herard that an accomplice would call Dorelus' cell phone later that evening with the location of the home where the drugs would ostensibly be hidden. At a point in the evening when the entire group of coconspirators were gathered together in the hotel room, the FBI telephoned Dorelus and provided the location of the home. Dorelus informed the group of the location and reported that the drugs could be found in a second floor closet of the

4

house, as well as behind a sheetrock wall.

Later that evening, the FBI observed Elliassaint parking a car with Herard, Charles, and Auguste inside in front of the home. Charles and Herard entered the home without any observable weapons. Subsequently, Auguste exited the automobile with an object wrapped in a white towel that he passed through a side door of the house to Charles. Elliassaint remained in the car. Inside the home, Charles, with gun in hand, and Herard were videotaped opening a second floor closet and knocking on the walls with their hands. The FBI agents then arrested Herard, Elliassaint, Charles, and Auguste and found a discarded nine-millimeter Beretta handgun inside the home.

We address the claims of the different appellants in turn.


**DISCUSSION**

1. HERARD, CHARLES & AUGUSTE

Herard, Charles, and Auguste present several issues for our review.[2] We

---

[2]Charles challenges his convictions and sentences on the grounds that: (1) the evidence was insufficient to support his conviction; (2) the trial court's Allen charge to the jury was improper due to its coercive nature; (3) the trial court erred in failing to exclude evidence of the sale of a shotgun and the weapon itself, impermissibly restricting his cross-examination of a government witness, and failing to grant a request for a continuance after the government submitted a transcript in an untimely manner; (4) the trial court constructively amended the superseding indictment in its instructions to the jury by using the general term "firearm" rather than the specific Beretta handgun named in the indictment; and (5) the court reporter failed to transcribe video and audio recordings presented at trial and, as a result, caused the trial court and this court

have carefully examined the entire record in this case and conclude that Herard,

Charles, and Auguste cannot prevail on their arguments for the reversal of their

convictions and sentences, either because there was no error, or because any error

that occurred was harmless.

We do address, however, the argument that reversal is warranted because the

court reporter failed to transcribe the recorded evidence presented at trial.[3]  The

evidence in this case consisted almost exclusively of audiotaped and videotaped

conversations between Dorelus and the coconspirators.  At trial, Dorelus served as

the narrator for these tapes, explaining as they were played the setting and context

of what transpired and verifying the identity of the speakers.  However, the court

---

to possess an incomplete record.

Herard challenges his convictions and sentences on the grounds that: (1) the evidence was insufficient to support his conviction; (2) the trial court's Allen charge to the jury was improper due to its coercive nature; (3) the trial court erred in failing to exclude evidence of the sale of a shotgun and the weapon itself; and (4) the trial court constructively amended the superseding indictment in its instructions to the jury by using the general term "firearm" rather than the specific Beretta handgun named in the indictment.

Auguste challenges his convictions and sentences on the grounds that: (1) the trial court's Allen charge to the jury was improper due to its coercive nature; (2) the trial court erred in failing to exclude evidence of the sale of a shotgun and the weapon itself, impermissibly restricting his cross-examination of a government witness, and failing to grant a request for a continuance after the government submitted a transcript in an untimely manner; (3) the trial court constructively amended the superseding indictment in its instructions to the jury by using the general term "firearm" rather than the specific Beretta handgun named in the indictment; (4) the court reporter failed to transcribe video and audio recordings presented at trial and, as a result, the trial court and this court possess an incomplete record; (5) the trial court mistakenly allowed the government to present extrinsic evidence relevant only to his character; and (6) that his 30-year sentence is unconstitutional under Apprendi v. New Jersey, 530 U.S. 466 (2000).
[3]Herard did not raise this argument on appeal and did not adopt the arguments of his co-appellants.  Elliassaint, however, did adopt Charles and Auguste's argument.

reporter did not transcribe the audio- and videotaped conversations that were admitted into evidence and played before the jury. Rather, before the tapes were played, the jury was given a transcript of the taped conversations that had been translated from Creole into English. During his testimony, Dorelus made several corrections to the transcripts because he believed that some statements were erroneously attributed to individuals who had not in fact made them.

Optimally, the transcribed testimony of the trial would include a full account of the court proceedings, including a verbatim transcription of all audiotaped and videotaped evidence presented to the jury. Absent this comprehensive recordation, the court reporter should provide some notation in the record that clearly identifies the specific place in the tape being played as well as the line and page number of the translated pages before the jury. Such a notation is especially warranted if specific testimony is proffered pertaining to particular sections of the translations. The lack of such guidance in this case made our review of the transcript quite onerous because, as noted above, Dorelus testified that the translated written transcript identified the wrong speaker on some segments of the tapes.[4]

Because the court reporter did not transcribe the audiotaped and videotaped

---

[4]CI Dorelus apparently submitted somewhere between seven (according to the government) and seventeen (according to the defense) revisions of his deposition testimony regarding the speakers and content of the taped conversations.

evidence, Charles, Auguste, and Elliassaint seek reversal.  See 28 U.S.C. § 753(b)

("Each session of the court...shall be recorded verbatim").  The government argues

that, though not in the trial transcript, all of the tape-recorded evidence presented at

trial is part of the supplemental record.  While the government concedes that the

language of section 753(b) clearly requires court reporters to transcribe all

proceedings held in a criminal court, it argues that minor technical violations do

not entitle the appellants to a new trial.  Appellee's Br. at 26 (citing United States

v. Medina, 90 F.3d 459, 462-63 (11th Cir. 1996)).

In Antoine v. Byers & Anderson, Inc., 508 U.S. 429 (1993), the Supreme

Court addressed the doctrine of judicial immunity as it applies in litigation against

court reporters.  The Court stated that "court reporters are required by statute to

'recor[d] verbatim' court proceedings in their entirety."  Id. at 436 (quoting 28

U.S.C. § 753(b)).  The Court further stated that court reporters "are afforded no

discretion in the carrying out of this duty; they are to record, as accurately as

possible, what transpires in court."  Id.

The right to a new trial based on a deficiency of the record, however, is

"premised upon the district court's inability to reconstruct the record."  United

States v. Cashwell, 950 F.2d 699, 704 (11th Cir. 1992).  A reconstructed record,

even if not identical to the original trial transcript and exhibits, will provide an

appellant with sufficient due process so long as it can "accord effective appellate review" of the issues raised on appeal. Id. at 703.

We have developed a bifurcated standard for determining whether an incomplete trial transcript entitles an appellant to a new trial. United States v. Preciado-Cordobas, 981 F.2d 1206, 1212 (11th Cir. 1993) (citing United States v. Selva, 559 F.2d 1303 (5th Cir. 1977)).[5]  If the same attorney represents an appellant at trial and on appeal, a new trial may be granted "only if the defendant can show that the failure to record and preserve a specific portion of the trial visits a hardship on him and prejudices his appeal." Id.  But if a new attorney represents the appellant on appeal, a new trial is necessary if there is a substantial and significant omission from the trial transcript.  Id.

Elliassaint is represented on appeal by his trial counsel.  Charles and Auguste are represented by attorneys who did not participate in the original trial. Accordingly, we must apply the first Selva standard (hardship and prejudice) to Elliassaint and the second Selva standard (substantial and significant omission) to Charles and Auguste.

We find that under the appropriate standards, the appellants are not entitled

---

[5]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

to a new trial. The determining factor here is that both this court and the trial court have been able to examine the evidence that was not transcribed at trial because the audiotapes and videotapes, as well as their written translated transcriptions, are before us as part of the supplemental record. As noted above, we agree with the appellants that the court reporter's failure to transcribe the recordings as they were presented to the jury did pose a substantial inconvenience to the process of review. But this inconvenience was not, in this case, an impediment to meaningful review. Although our review was made more difficult, we were nonetheless able to fully reconstruct the record and satisfy ourselves that sufficient evidence of these defendant's conspiracy was presented to the jury. See Preciado-Cordobas, 981 F.2d at 1214-15. Accordingly, we find no reversible error in the court reporter's failure to fully transcribe the recorded evidence presented at trial.

## 2. ELLIASSAINT'S INSUFFICIENT EVIDENCE CLAIM

Having found no reversible error as to three of the co-defendants, we turn to the case against Elliassaint. An extensive review of the record leads us to conclude that the evidence presented at trial as to Elliassaint's guilt does not meet the requisite standard of proof beyond a reasonable doubt.

There is no question in this case that under the proof adduced, Elliassaint would have been guilty of conspiracy to commit burglary and robbery. However, these are not, of themselves, federal crimes. Elliassaint was charged with conspiracy to possess with the intent to distribute cocaine and conspiracy to carry a firearm in furtherance of that crime. Thus, in order to support a guilty verdict, the government had to prove beyond a reasonable doubt not only that Elliassaint participated in an agreement to burglarize a house and rob it, but that the specific purpose of the robbery was to steal cocaine in order to distribute it. See United States v. Badolato, 701 F.2d 915, 919-20 (11th Cir. 1983) (conviction for drug conspiracy requires agreement to violate narcotics law).

Whether there is sufficient evidence to support a conviction is a question of law which this Court reviews de novo. United States v. Tarkoff, 242 F.3d 991, 993 (11th Cir. 2001). The relevant inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

To sustain Elliassaint's convictions on the 21 U.S.C. §§ 841 and 846 conspiracy counts, we must find the government offered sufficient evidence to prove beyond a reasonable doubt that: 1) an illegal agreement existed to possess

11

with the intent to distribute cocaine; 2) Elliassaint knew of this agreement; and 3) Elliassaint knowingly and voluntarily joined the agreement. See United States v. McDowell, 250 F.3d 1354, 1365 (11th Cir. 2001); United States v. Calderon, 127 F.3d 1314, 1326 (11th Cir. 1997) (citation omitted). Where the government's case is based on circumstantial evidence, "reasonable inferences, and not mere speculation, must support the jury's verdict." United States v. Perez-Tosta, 36 F.3d 1552, 1557 (11th Cir. 1994). Although presence is certainly a factor to consider in determining whether a defendant joined a conspiracy, it is well settled that mere presence will not support a conviction. McDowell, 250 F.3d at 1365 (citation omitted) ("mere presence at the scene of a crime is insufficient to support a conspiracy conviction, [but] presence nonetheless is a probative factor which the jury may consider in determining whether a defendant was a knowing and intentional participant in a criminal scheme."). Thus, although the government is not required to prove that Elliassaint knew every detail or that he participated in every stage of the conspiracy, United States v. Diaz, 190 F.3d 1247, 1254 (11th Cir. 1999), the government must prove that he "knew the essential nature of the conspiracy." United States v. Payne, 750 F.2d 844, 859 (11th Cir.1985).

The government argues that Elliassaint's conviction is supported because he was present on one occasion with the other defendants in the hotel room and

12

because he drove the car transporting Charles, Herard, and Auguste to the crime scene. Elliassaint concedes that he intended to, and in fact did, participate in a conspiracy to perform a home invasion robbery as the driver of the getaway car. However, he contends that the evidence failed to show the requisite knowledge on his part that the specific object of the robbery was drugs and not simply money or other valuables. He argues that his case is analogous to United States v. Martinez, 83 F.3d 371 (11th Cir. 1996), in which we reversed the conviction of an alleged coconspirator to a drug theft because the government failed to present evidence the individual had any knowledge "that the true object of the burglary was cocaine." Id. at 374.

Having carefully reviewed the videotape and transcript of the one meeting in the wired hotel room that Elliassaint attended, as well as the remainder of the evidence regarding the other defendants, we agree. The facts of Martinez are surprisingly similar to the instant case. Martinez involved an alleged conspiracy between Martinez, Gallo, and Gomez to perform a home invasion robbery of narcotics. See id. at 373. The conspiracy began when an undercover Metro-Dade Police Department (Miami, Florida) detective received a phone call from Gallo. See id. Gallo told the detective that he was interested in executing a drug rip-off and that he had "men and guns ready." See id. at 374. Days later, the detective

13

met with Gallo and a confidential informant who, in the role of a drug dealer, informed Gallo of an opportunity to steal 50 kilograms of cocaine from an unguarded house  See id. at 373.  The next day, the detective placed 5 kilograms of cocaine and 45 kilograms of another substance in a suitcase and put the suitcase inside an abandoned house.  He subsequently met with Gallo in a shopping center parking lot.  See id.  Martinez and Gomez were present at the parking lot, but in a separate vehicle.  See id.  All three of the defendants then followed the detective to a service station.  See id.  There, the confidential informant met the men and brought Gallo to view the location of the abandoned house.  See id.  When Gallo returned, Gomez entered his car and, with Martinez following in another vehicle, the three men drove to the house.  See id.  With guns in hand, Gallo and Gomez approached the house, broke in, and attempted to remove the suitcase with the cocaine inside.  See id.  All three men were then arrested.  See id.

Because there was no evidence that Gomez knew he was going to the abandoned house to steal drugs, we reversed his convictions for conspiracy to possess cocaine and use of a firearm in the commission of a drug offense.  See id. at 374.  The record in Martinez did not "show that Gallo--or anyone else--ever told Gomez that the true object of the burglary was cocaine."  Id.  We reached similar conclusions in United States v. Stanley, 24 F.3d 1314, 1316-21 (11th Cir. 1994)

14

(reversing the conviction of a passenger in car containing cocaine because there was no evidence that she "had any knowledge of the illegal drug activity" or a "consciousness of guilt," though an alleged coconspirator had approached her car and asked "where the dope was"), and United States v. Hernandez, 896 F.2d 513, 519-20 (11th Cir. 1990) (reversing the conviction of a passenger in a car containing cocaine who was present when an alleged coconspirator delivered the cocaine to an undercover detective).

Similarly, the record in this case contains no evidence that indicates Elliassaint knew the goal of the conspiracy was to steal narcotics.[6] The government offered no witness or evidence at trial that showed Elliassaint had knowledge that the conspiracy involved drugs. Indeed, there was little testimony

_____

[6]In a post-arrest interview, Elliassaint volunteered that the purpose of the home invasion was to steal money. FBI Agent Panella subsequently asked Elliassaint if he knew that the house contained drugs. In response to this question, Elliassaint replied only that he was "not sure." R20-1141. This ambiguous statement alone does not support a reasonable inference that Elliassaint knew the burglary involved drugs. See United States v. Hamblin, 911 F.2d 551, 558 (11th Cir. 1990). In Hamblin, we examined the section 924(c) liability of the driver of a getaway car in several armed bank robberies. See id. The only link between Hamblin and the gun used in one of the robberies was an ambiguous statement he made to FBI agents. The statement was as follows: "I dropped Jones off and waited for him to go inside and get the money. Jones was wearing a long sweater coat and ski mask and was carrying a gun in his pants pocket...After [Jones got] inside the bank, I heard a shot fired. Shortly afterwards Jones came running out..." See id. We held that Hamblin's statement did not clearly demonstrate whether his knowledge of the gun came before or after he heard gunshots from the interior of the bank. See id. Because the statement was unclear as to the timing of his knowledge, and provided the sole link between Hamblin the gun, we found that the evidence presented by the government was insufficient to sustain his section 924(c) conviction. See id. Elliassaint's response to Agent Panella's question in this case is similarly ambiguous and cannot provide the sole link between Elliassaint and the drugs.

15

about Elliassaint at all, and the evidence presented was limited to the fact that he accompanied Charles to a single meeting at the hotel "war room" and drove the car used in the burglary. The government's principal witness, the CI Dorelus, never mentioned Elliassaint during his direct testimony in which he described the conspiracy and its members. And Elliassaint appears only in a single videotaped meeting at the hotel in which he follows Charles into the room, sits passively in the back during the conversations conducted primarily in Creole, and then follows Charles as he leaves.

Initially, we note that during the time Elliassaint was present in the hotel "war room" it is not at all clear that there were any discussions about drugs at all. The videotaped recordings show only that the coconspirators engaged in general conversations about the burglary itself, not about drugs or drugs as the object of the burglary.[7] Neither this videotaped evidence, nor any other evidence presented at trial, showed that Elliassaint had ever been told that the object of the burglary was drugs.

_____

[7]The videotaped evidence does contain some isolated comments in Creole that may or may not have been about drugs. Gov. Ex. 8 p. 31. For example, Dorelus described where in the house the coconspirators should look for "the stuff." Id. These brief comments were not elaborated upon and the word "drugs", "cocaine", or "kilos" were not mentioned while Elliassaint was in the hotel room. As noted, there was no other evidence of any meeting or conversations involving Elliassaint that could provide the inference that he could have understood the ambiguous word "stuff" to mean drugs.

16

Equally as important, all of the conversations regarding the purpose of the burglary were conducted in Creole, and the government presented no evidence that Elliassaint could speak or understand Creole. Indeed, when specifically asked during cross examination, Dorelus testified that he did not know whether Elliassaint spoke or understood Creole. To the contrary, the evidence presented at trial was that, unlike some of the other members of the group, Elliassaint (a nineteen year old at the time of this event) was born in the United States and attended school in the United States until the 11th grade. This is significant because the only conversation between the coconspirators that even arguably addressed drugs, and which occurred in Elliassaint's presence, was conducted in Creole.[8] Thus, Elliassaint was not present for any unambiguous statements about drugs and, even if he had been, no evidence presented at trial showed that Elliassaint could understand what was said.

Nor is there any non-verbal evidence in the videotape to indicate that Elliassaint knew what was being said. Our own extensive review of the videotapes confirms that Elliassaint, although present in the hotel room, never interacted with any of the participants during their conversations. From the time he accompanied Charles into the hotel room until he left, Elliassaint never once addressed, nor was

---

[8]See supra, note 7.

17

he addressed by, any of the others in the room. Instead, the videotapes show that during the time he was in the room, Elliassaint essentially sat on the sidelines, watching a basketball game on the television, napping, or passively staring.

As in Hernandez, 869 F.2d at 520, we agree with the government that the evidence presented at trial was sufficient to convict Elliassaint of his involvement in a conspiracy. The jury certainly could have reasonably concluded that Elliassaint knew of, and voluntarily joined in, a conspiracy to perform a home invasion. However, as in Martinez, 83 F.3d at 374, the government presented no evidence that Elliassaint knew the conspiracy involved the theft of narcotics, and no reasonable inference could support such a finding. See also Stanley, 24 F.3d at 1321; Hernandez, 896 F.2d at 520. Even when taken in the light most favorable to the government, we believe sufficient evidence did not exist for the jury to conclude Elliassaint knew that the conspiracy involved drugs. See Martinez, 83 F.3d at 374. We therefore reverse Elliassaint's convictions, both of which are predicated upon his knowledge of a conspiracy to possess cocaine.

**AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**