NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a1270n.06

Nos.  11-3913, 11-3997

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
*Dec 11, 2012*
DEBORAH S. HUNT, Clerk

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

      v.

DAMIEN T. RUSS,

    Defendant-Appellant.

On Appeal from the United
States District Court for the
Northern District of Ohio

_____/

**Before:  GUY, DAUGHTREY, and STRANCH, Circuit Judges.**

    **RALPH B. GUY, JR., Circuit Judge.**   Defendant Damien Russ appeals his conviction and sentence for being a felon in unlawful possession of a firearm in violation of 18 U.S.C. § 922(g)(1), and the subsequent revocation of and consecutive sentence for violation of the supervised release portion of a prior federal sentence for distributing cocaine base in violation of 21 U.S.C. § 841(a)(1).[1]  In these consolidated appeals, Russ contends that the district court erred in denying his motion to suppress evidence—namely, the firearm that Russ allegedly discarded while fleeing from police officers—and in rejecting his *Batson*

_____

[1]The prior federal sentence for distributing cocaine base included an eight-year term of supervised release, which had been enhanced due to an earlier felony drug conviction.

objections to the government's use of three peremptory challenges. *Batson v. Kentucky*, 476 U.S. 79, 89 (1986).  Russ also claims that the evidence was insufficient to support his felon-in-possession conviction, and that the sentences imposed for both the firearm conviction and the supervised release violation were unreasonable.  While affirming the denial of the motion to suppress, we find error in the district court's ruling on the *Batson* objection that requires us to reverse both the felon-in-possession conviction and the revocation of his supervised release and remand for further proceedings consistent with this opinion.

## I.

Defendant Damien Russ was arrested after fleeing from officers in the early morning hours of July 10, 2010.  He was charged in a one-count indictment with being a felon in unlawful possession of a .38 caliber revolver that was recovered after a canine unit conducted a search along the path Russ had taken during his flight.  Russ moved to suppress the firearm and ammunition as fruit of an illegal seizure.  After an evidentiary hearing and additional briefing, the district court found (1) that the initial encounter between Russ and the officers was a consensual encounter—not a seizure for Fourth Amendment purposes—and (2) that "Russ's actions, including his conduct in pushing [Deputy U.S. Marshal] Boldin and then running away, coupled with the fact that Boldin observed a firearm on Russ while he was fleeing, gave the [o]fficers reasonable suspicion to detain him." *United States v. Russ*, 772 F. Supp. 2d 880, 886 (N.D. Ohio 2011).  For the reasons fully set forth in its opinion and order, the district court denied the motion to suppress because there had been no Fourth

Amendment violation. *Id*. at 892.

Jury selection was conducted on May 10, 2011, with the entire 43-member venire panel being given instructions and asked to complete written jury questionnaires. Some of the prospective jurors were called into the courtroom for follow-up questions concerning some of the answers they provided. Prospective jurors 10 and 26 were questioned individually, and the government sought to but did not question prospective juror 17 individually. Eleven venire members were excused for cause. After the government's third peremptory challenge, defense counsel objected to the government's challenges to jurors 10 and 17. The district court engaged in a brief discussion addressing the government's racially neutral reasons and deemed the *Batson* challenge to be essentially waived because it was untimely. When the government exercised its fourth peremptory challenge to excuse juror 26, defense counsel made another *Batson* objection. The government articulated its race-neutral reason, and the district court found that, like juror 10, juror 26 had been excused for reasons other than race. The government waived its last peremptory challenge, two alternate jurors were seated, and the jury was sworn.

Since we reverse on the grounds of a *Batson* error and need not reach the sufficiency-of-the-evidence claim, we do not summarize the evidence presented at trial except to note that the defense disputed that Russ had possessed the firearm in question. The jury returned a verdict of guilty on May 13, 2011, which also formed the basis for the alleged violation of

his supervised release. On August 10, 2011, Russ was sentenced above the Guidelines to a 97-month term of imprisonment for the § 922(g)(1) conviction. The district court conducted a hearing, revoked Russ's supervised release, and sentenced Russ to a consecutive 18-month term of imprisonment. These consolidated appeals followed.

## II.

On appeal from the decision on a motion to suppress evidence, we review the district court's factual findings for clear error and its legal conclusions de novo. *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002). When, as here, the district court denied the motion to suppress, we must view the evidence in the light most favorable to the government. *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (en banc); *see also United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010). The district court's assessment of credibility is accorded deference "'inasmuch as the court was in the best position to make such a determination.'" *United States v. Garrido*, 467 F.3d 971, 977 (6th Cir. 2006) (citation omitted).

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *Terry v. Ohio*, 392 U.S. 1, 9 (1968)). An officer may approach an individual and "generally ask questions of that individual," or " ask to examine that individual's identification" as long as the police do not convey that compliance is required. *Florida v. Bostick*, 501 U.S. 429,

434-35 (1991). "In order for a seizure to occur, the encounter must not be consensual and the officers must use physical force or the individual must submit to the officers' show of authority." *Smith*, 594 F.3d at 535 (citing *Brendlin v. California*, 551 U.S. 249, 254 (2007); *California v. Hodari D.*, 499 U.S. 621, 628 (1991)). We have explained that "a consensual encounter becomes a seizure when 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *United States v. Jones*, 562 F.3d 768, 772 (6th Cir. 2009) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). Russ insists, as he did in the district court, that the initial encounter was not consensual but constituted a seizure by virtue of the officers' show of authority.

The testimony given during the suppression hearing, which is set forth in detail by the district court, established that the Deputy U.S. Marshal (DUSM) William Boldin and Lordstown Police Detective Christopher Bordonaro were partners assigned to a Violent Fugitive Task Force on July 10, 2010. On that day, at roughly 2:30 a.m., Boldin and Bordonaro responded to a call to assist other officers with a fight taking place at the Powerhouse Bar and Grill, where several shootings and gun-related offenses had occurred in the past. Boldin and Bordonaro arrived in an unmarked dark-colored Dodge Charger, stopped in the parking area by the front entrance, and assisted with disbursing the crowd. Then, wearing vests with the words "U.S. MARSHAL" and "POLICE" on the front and back, Boldin and Bordonaro drove in the Charger around to the parking lot in the back where the encounter with Russ occurred.

Entering the parking lot, the two officers observed Russ and his girlfriend, a woman later identified as Michelle Jones, near the employee entrance. A white Cadillac was parked near the employee entrance, and a second car was parked to the left of the employee entrance staircase. As the district court described:

> The Officers observed Russ walking down the stairs from the employee entrance toward the Cadillac but noticed that, when he saw the officers pull into the lot, Russ "started to walk away from the car." DUSM Boldin recognized Russ from prior "law enforcement contacts with him," but could not recall his name or why he remembered him. The Officers exited their vehicle and DUSM Boldin approached Russ. Boldin testified that,

> > immediately as I started to walk close to him, before I could really even say or do anything, he appeared startled, he appeared nervous, basically took a fighting stance. He clenched his fist, got a very determined look on his face, and began looking to his left and his right []very rapidly.

> Based on Russ's behavior, DUSM Boldin "felt that there was something wrong," and asked Russ "if everything was okay." Russ responded "no," and "[a]s he was saying that he began to clench his fists" and took a "fighting stance." Boldin testified that, at that point, he:

> > felt that something was going to happen. I wasn't sure if he was going to run, if he was going to assault me, or what was going to happen, but I saw indicators that something bad was going to happen, something out of the ordinary. I immediately started to yell at him not to do it, whether it was going to be to run or fight, or whatever he was going to do. I said, "Don't do it."

> As he was telling Russ "don't do it," DUSM Boldin recalls that Russ "was raising his hand towards me, kind of swung his left arm towards me, and began to run." DUSM Boldin testified that, as Russ "began to charge and swing" at him, Boldin grabbed at Russ, but his grabbing "was in response to [Russ's] aggressive action."[2] Russ made "a pushing kind of contact" with Boldin, causing Boldin to lose his balance momentarily on the gravel parking lot. As he was regaining his balance and turning to chase Russ, DUSM Boldin noticed

a "shiny object in his right waistband area" which he "instantly recognized []
as a firearm."

> [2]The Officers testified that the initial interaction between DUSM
> Boldin and Russ "happened in a matter of mere seconds, if not
> less than that." Indeed, DUSM Boldin explained that Russ's
> "physical swinging of his arm toward me happened
> simultaneously with him starting to run."

> DUSM Boldin yelled to [Officer] Bordonaro that Russ had a gun, and
> used his radio to notify other officers in the area that they were chasing an
> individual who had a firearm. Both of the Officers pursued Russ on foot, and
> TFO Bordonaro deployed his taser, which struck Russ in the back but was
> ineffective in stopping him. The Officers testified that they lost sight of Russ
> temporarily, but ultimately located him hiding behind trees and bushes near the
> front porch of a house.

> Although the Officers ordered Russ to come out from his hiding place,
> Russ failed to comply and had to be physically removed. He was then arrested,
> but did not have the firearm on his person at the time of arrest. Accordingly,
> a canine unit responded to the scene to search for the weapon. The dog
> searched along the path Russ had traveled, and alerted the Officers to a
> specific area to search. DUSM Boldin observed the weapon laying on the
> ground in the identified area, and waited for officers from the Warren police
> department to photograph the gun and take it into evidence. TFO Bordonaro
> testified that, although the ground conditions in the area were wet, he observed
> that the firearm appeared to be dry . . . . Neither Boldin nor Bordonaro handled
> the firearm.

*Russ*, 772 F. Supp. 2d at 883-84 (citations to the record omitted).

The district court credited Boldin's testimony that he parked the Charger "in such a

way that it was not blocking either vehicle from exiting," *id* at 883, over Jones's statement

that the officers parked diagonally so as to block either car from leaving, noting that Jones

was able to drive away after the officers began to chase Russ on foot, *id*. at 889. There is no

dispute that there were only two officers, that they both got out of their vehicle, that neither

drew a weapon, and that both wore vests identifying them as law enforcement. The district court did not err in finding that the manner in which the vehicle was parked did not transform their arrival into a seizure. *Id*. at 888-89. Also, "[a]n encounter does not become compulsory merely because a person identifies himself as a police officer." *United States v. Carr*, 674 F.3d 570, 573 (6th Cir. 2012).

Boldin approached, noticing Russ's demeanor, and a brief exchange followed. Although Jones testified that Boldin went right up to Russ and grabbed his shoulder, she also testified that Russ was swinging his right arm and Boldin was grabbing Russ's right shoulder. Evaluating the testimony, the district court found, as a factual matter, that "the only physical contact between Russ and DUSM Boldin consisted of Russ pushing Boldin, and Boldin trying to grab at Russ to stop the contact." *Russ*, 772 F. Supp. 2d at 890. Just before that contact, Boldin asked Russ if everything was okay and Russ's response caused Boldin to yell "don't do it" as Russ swung his arm, pushed against Boldin, and took off running. As the district court concluded, under the circumstances, yelling "don't do it" did not elevate the encounter to a seizure. *Id.* But even if it were a show of authority that could constitute a seizure, "Russ was not seized because he fled and thus did not submit to that authority." *Id.* (citing *Brendlin*, 551 U.S. at 262); *see also United States v. Jones*, 673 F.3d 497, 501-02 (6th Cir.), *cert. denied*, 133 S. Ct. 350 (2012).

Finally, we need not determine whether there was reasonable suspicion at an earlier point in time because no seizure occurred until Russ was located hiding in some bushes.

Rather, it is sufficient to conclude, as the district court did, that once Boldin saw what he recognized to be a firearm in Russ's waistband, the totality of the circumstances at that point—including Russ's demeanor, his response when asked if everything was okay, his physical contact with and flight from Boldin—provided reasonable suspicion to justify an investigative detention. *Russ*, 772 F. Supp. 2d at 891-92. When Russ was finally seized, the officers had reasonable suspicion to detain him such that the subsequent canine search for the firearm was not fruit of an illegal seizure. The district court did not err in denying Russ's suppression motion.

## III.

The Equal Protection Clause of the Fourteenth Amendment and the Due Process Clause of the Fifth Amendment prohibit a party from using its peremptory challenges to exclude members of the venire on account of their race. *Batson v. Kentucky*, 476 U.S. 79, 85-86 (1986); *see also United States v. Jackson*, 347 F.3d 598, 604 (6th Cir. 2003). Here, defense counsel objected twice: after the government exercised its third peremptory challenge—having excused juror 10 (who was believed to be Hispanic) and juror 17 (who was believed to be Asian)—and again after the government used its fourth peremptory challenge to excuse juror 26 (who was determined to be of Turkish descent). *Batson*'s constitutional protection is recognized as prohibiting the exercise of peremptory challenges based on race whether or not the excluded juror and the defendant are of the same race. *Powers v. Ohio*, 499 U.S. 400, 402 (1991). Russ argues that the district court

misapprehended the *Batson* inquiry by referencing the fact that Russ is African American, but it is clear from the record that the district court did not reject Russ's *Batson* challenges on that basis.[2]

Under *Batson*'s tripartite analysis, Russ first must "make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'" *Johnson v. California*, 545 U.S. 162, 168 (2005) (quoting *Batson*, 476 U.S. at 93-94). Once this showing is made, "the 'burden shifts to the [government] to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes." *Id*. (quoting *Batson*, 476 U.S. at 94). The reason should be considered "neutral" if it is based on something other than the race of the juror, and it "need not be particularly persuasive, or even plausible, so long as it is neutral." *United States v. Harris*, 192 F.3d 580, 586 (6th Cir. 1999) (citing *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995) (per curiam)). If a race-neutral reason is offered, the court must then decide in the third step whether the defendant has carried his burden of proving purposeful discrimination. *Purkett*, 514 U.S. at 767. The critical question at step three is the persuasiveness of that reason, which comes down to its credibility. *Miller-El v. Cockrell*, 537 U.S. 322, 338-39 (2003). The district court's finding on the issue of discriminatory intent is a fact question that is accorded significant deference. *Id*. at 339.

---

[2]Russ also claims that the district court made a mistake of law by commenting that one of the seated jurors was African American. While the presence of one juror of defendant's race on the jury does not preclude him from making a *Batson* challenge, *United States v. Harris*, 192 F.3d 580, 587 (6th Cir. 1999), Russ's *Batson* objections were not overruled for that reason.

## A.      Jurors 10 and 17

Defense counsel objected pursuant to *Batson* and relied on the names and appearances of jurors 10 and 17 to surmise that they were of minority races and to assert a prima facie showing based on race. Counsel for the government responded both by expressing uncertainty about whether the jurors in question were minorities and by asserting race-neutral reasons for the challenges. Specifically, juror 10 was excused because "he indicated that he had certain problems in deciding the guilt of a person." With respect to juror 17, counsel said his challenge was "based on my questions or the questions asked by the court."

The district court faulted defense counsel for failing to object while the jurors were still in the courtroom and could be questioned regarding the objection. The district court explained that there was no way to know juror 17's racial or ethnic background or whether she was excused on account of her race and deemed the issue essentially waived. With respect to juror 10, the district court also stated that the race-neutral reason had presented a close question of whether to excuse him for cause. That is, when questioned individually during voir dire, juror 10 had indicated that he would be "hesitant" and "uncomfortable" about making a determination as to guilt or innocence. The district court later confirmed that the government had a compelling race-neutral reason for striking juror 10.

### a.      *Batson* Analysis

Arguing on appeal that no error occurred, the government contends that Russ failed

to make a prima facie showing because nothing in the record established the race or ethnicity of either of these challenged jurors. Whether or not Russ could have made this showing is immaterial. When the trial court fails to make a finding concerning the prima facie case before a race-neutral reason for the challenge is offered "and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez v. New York*, 500 U.S. 352, 359 (1991) (plurality opinion); *see also Harris*, 192 F.3d at 587. That is precisely the situation with respect to juror 10 since the government immediately articulated its race-neutral reason—that juror 10 said he was uncomfortable determining guilt or innocence—and the district court found that reason to be compelling. The government need not rely on a failure at step one because the district court evaluated the proffered reason and determined that the defendant had not established purposeful discrimination. That finding is entitled to deference on appeal.

However, the district court did not reach the ultimate question of intentional discrimination with respect to juror 17. Defense counsel expressed the belief that juror 17 was Asian, and the government acknowledged that the juror might be a minority before offering a purportedly race-neutral basis for excusing her.[3] The government urges us to find that the district court essentially found that no prima facie case had been shown, while Russ

---

[3]In fact, the government had asked to question juror 17 individually concerning her response to the written question about scientific evidence, but the district court deferred the matter with the intention of addressing the issue with jurors collectively.

claims that the district court erred by accepting the government's non-specific reason and improperly truncating the second and third steps of the *Batson* analysis. *See United States v. Cecil*, 615 F.3d 678, 686 (6th Cir. 2010), *cert. denied*, 131 S. Ct. 1525 (2011). Neither characterization is supported by the record. Rather, it is evident that the district court completely short-circuited the *Batson* analysis with respect to juror 17 because the objection was deemed to be untimely. Although the government does not argue for waiver on appeal, the district court's failure to engage in the *Batson* analysis was error unless the objection was waived.

### b.      Timeliness

The Court in *Batson* expressly declined to decide when an objection must be made in order to be timely, but clearly envisioned that a defendant would be required to make a timely objection to the government's use of its peremptory challenges. *Batson*, 476 U.S. 99-100; *see also Ford v. Georgia*, 498 U.S. 411, 422-23 (1991) (noting that a state court could sensibly require that a *Batson* claim be raised between the selection of the jurors and the administration of the oath). Indeed, the remedies discussed in *Batson* presuppose an objection during the jury selection process by indicating that the trial court could choose whether to discharge the venire panel and begin anew, or to disallow the discriminatory challenge and resume jury selection with the same venire panel. *Batson*, 476 U.S. at 99 n.24; *see also Haney v. Adams*, 641 F.3d 1168, 1172-73 (9th Cir.), *cert. denied*, 132 S. Ct. 551 (2011). In addition, requiring a prompt objection ensures that the trial court can properly

evaluate the objection under *Batson* by allowing the trial court to determine the juror's race, evaluate the juror's demeanor, and assess the credibility of the purportedly race-neutral reason for excusing the juror. *Haney*, 641 F.3d at 1172-73; *see also McCrory v. Henderson*, 82 F.3d 1243, 1247-48 (2d Cir. 1996) ("the nature of the peremptory challenge mandates that any objection to its use be raised and ruled upon promptly"). It also prevents manipulation or "sandbagging" by delaying the objection until after trial started or ended unfavorably. *McCrory*, 82 F.3d at 1247-48.

Taking cues from *Batson*, many circuits have required that a contemporaneous objection must be made, at the latest, before the venire is dismissed in order to preserve the *Batson* claim. *See, e.g.*, *Morning v. Zapata Protein (USA), Inc.*, 128 F.3d 213, 216 (4th Cir. 1997); *United States v. Parham*, 16 F.3d 844, 847 (8th Cir. 1994); *United States v. Maseratti*, 1 F.3d 330, 335 (5th Cir. 1993). Other courts have suggested that the objection should be made as soon as possible, or during voir dire, in order to be timely. *See United States v. Cashwell*, 950 F.2d 699, 704 (11th Cir. 1992); *United States v. Contreras-Contreras*, 83 F.3d 1103, 1104 (9th Cir. 1996). Consistent with the approach taken by other circuits, this court held in an unpublished decision that a *Batson* objection made after the venire was dismissed and the jury empaneled was untimely. *United States v. Peraza*, 25 F.3d 1051 (6th Cir. 1994) (table), 1994 WL 228244, at *2 (holding that defendant waived his right to question the propriety of the government's peremptory challenge). That does not resolve the issue here, however, since Russ's counsel did not delay in making the objection until after the venire had

been dismissed.

In another case, this court declined to address the government's contention that the defendant had waived his *Batson* challenge by making the objection at the close of voir dire and not when that juror was excused. *United States v. Copeland*, 321 F.3d 582, 600 n.4 (6th Cir. 2003). We also need not decide this question—under what circumstances a *Batson* challenge made before the venire is dismissed may be deemed to be untimely—because Russ promptly, and by any fair reading of the record, contemporaneously objected to the government's exercise of its peremptory challenge to excuse juror 17. In fact, the time stamp in the transcript reflects that defense counsel raised the *Batson* challenge by objecting less than one minute after juror 17 had been "thanked and excused." In that brief time, juror 17 apparently left the courtroom. Nonetheless, no effort was made either to locate juror 17 or to engage in the *Batson* analysis, applying the assumption that she was of Asian descent. This finding of waiver effectively circumvented the *Batson* inquiry, which resulted in structural error that is not subject to harmless error review. *Harris*, 192 F.3d at 588; *United States v. McFerron*, 163 F.3d 952, 955-56 (6th Cir. 1998).

**B.      Juror 26**

When the government used its fourth peremptory challenge to excuse juror 26, defense counsel immediately made his second *Batson* objection based on the juror's appearance. Timeliness was not an issue. Without waiting for a ruling on the prima facie showing, the government responded that the juror's race was unknown and offered race-

neutral reasons for striking juror 26. The government explained that the juror was an economist by occupation and that

> one of the questions, which is relating to DNA analysis, as a prosecutor, I have my own preconceived notions how demanding a juror can be; and thus, basically, I think it's a right of the government's strategy to select a juror that's best for the government's case. Our determination is based on the answers from the juror, not on the race of the juror, and as I indicated, I don't know what his race is.

The district court found that, just as the government had provided a compelling reason for excusing juror 10, juror 26 had similarly been excused for reasons other than race. Specifically, the district court was persuaded that this juror was challenged "based upon his education, training and background as an economist." Russ complains that only after this ruling did the district court conduct voir dire at side bar to determine that juror 26 was originally from Turkey.

As was the case with juror 10, however, the preliminary issue of whether defendant made a prima facie showing as to juror 26 is moot because the government articulated its race-neutral reasons and the district court ruled on the ultimate question of intentional discrimination. *Harris*, 192 F.3d at 587. Defendant also argues for the first time on appeal that the district court erred by accepting the government's pretextual basis for excusing juror 26. We have said that a defendant's "failure to argue pretext may even constitute waiver of his initial *Batson* objection." *Jackson*, 347 F.3d at 605. Whether we review for plain error or not, Russ bore the burden to show that the explanation was merely a pretext for racial discrimination. *Braxton v. Gansheimer*, 561 F.3d 453, 459 (6th Cir. 2009).

A peremptory challenge may be based on a juror's education or occupation. *See United States v. Campbell*, 317 F.3d 597, 605-06 (6th Cir. 2003); *United States v. Simon*, 422 F. App'x 489, 494 (6th Cir.), *cert. denied*, 132 S. Ct. 351 (2011). Defendant argues for the first time on appeal that pretext is shown because the answer given by juror 26 concerning scientific evidence was similar to the answers given by other prospective jurors. This does not support defendant's claim of pretext, however, because juror 26 was not the only juror asked about his attitudes toward scientific and/or DNA evidence who was excused or challenged. The government sought to question five jurors concerning the issue: two were excused for cause for other reasons (jurors 8 and 22) and the government used its peremptory challenges to excuse the other three (jurors 5, 17 and 26). The record does not support the claim that the government's use of its peremptory challenge to excuse juror 26 was pretextual. The district court did not clearly err in finding the race-neutral reasons to be credible. *See Braxton*, 561 F.3d at 459; *see also Miller-El*, 537 U.S. at 339 (holding that the factors for measuring credibility include "whether the proffered rationale has some basis in accepted trial strategy").

**IV.**

The denial of defendant's motion to suppress evidence is **AFFIRMED**. Because the *Batson* error with respect to juror 17 is structural, defendant's conviction and revocation of supervised release are **REVERSED** and the matter is **REMANDED** for further proceedings consistent with this opinion.