No. 00-292

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 16

STATE OF MONTANA,

Plaintiff and Respondent,

v.

JOSEPH LESTER DESCHON,

Defendant and Appellant.

APPEAL FROM: District Court of the First Judicial District,

In and for the County of Lewis and Clark County,

Honorable Thomas C. Honzel, Judge Presiding

COUNSEL OF RECORD:

For Appellant:

Chad Wright, Appellate Defender, Helena, Montana

For Respondent:

Honorable Mike McGrath, Attorney General; Tammy Plubell,

Assistant Attorney General, Helena, Montana

Leo Gallagher, County Attorney, Helena, Montana

Submitted on Briefs: June 21, 2001
Decided: January 30, 2002

Filed:

_____

Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶Appellant Joseph Deschon was convicted in the First Judicial District Court, Lewis and Clark County, of Deliberate Homicide. He appeals. We remand for further proceedings consistent with this opinion.

¶2 We re-state the issues on appeal as follows:

¶3 1. Was Deschon denied effective assistance of counsel because his counsel had a conflict of interest that adversely affected his performance?

¶4 2. Was Deschon's right to due process violated because no transcript of voir dire exists for review on appeal?

## FACTS AND PROCEDURE

¶5 In the fall of 1999, Deschon's nephew, James Anthony Azure, came to Montana to be with his family. He stayed at Deschon's apartment. Approximately five weeks later, Azure's girlfriend, Cheryl Gouge, arrived from Minnesota with her two-year-old son. Azure, Gouge and her son stayed at Deschon's apartment, sleeping on a futon in the living room.

¶6 On the afternoon of November 6, 1999, Deschon, Azure and Gouge were at a friend's apartment drinking and socializing and playing cards. There was noticeable tension between Deschon and Azure when the three left at six that evening. Before returning to Deschon's apartment, Azure stopped and bought more beer. Azure, Deschon and Gouge then had a few more drinks at Deschon's apartment. Azure and Deschon began arguing, and Deschon asked Azure to leave the apartment. Azure left the apartment twice for an hour each time. A neighbor testified that she heard Deschon yelling by the back door of the building and telling people to get out of the apartment. She asked them to keep it

down, and Azure responded by yelling profanities at her.

¶7 A fight eventually broke out between Deschon and Azure. Gouge was in the other room at the time, changing her son's diaper. Deschon told a police officer that he and Azure were arguing and that "out of the blue" Azure punched him and, as a result, he fell into the counter, cutting his head. Gouge testified that she heard a lamp break and looked up to see Deschon punching Azure. When Azure stood up, Gouge saw blood on his shirt. She stated he was covered in blood and turned white and pale and complained that he couldn't breathe. Deschon told Gouge to call 911, and he began performing CPR on Azure.

¶8 The police arrived, and Azure was taken to the hospital. When he arrived at the hospital, he was in cardiopulmonary arrest. Dr. Harper performed an emergency thoracotomy and discovered that the sack surrounding the heart was full of blood. Dr. Harper discovered a hole in the heart and repaired it. Ultimately, the doctors determined that Azure had suffered irreversible brain damage from the lack of oxygen. Approximately a week later, Azure's family decided to remove him from life support, and he died soon after. The state medical examiner concluded that Azure died from complications of a stab wound to the chest.

¶9 Deschon admitted stabbing Azure, but told police that he was protecting himself.

¶10 On November 19, 1999, the State of Montana charged Deschon with Deliberate Homicide, a felony, in violation of § 45-5-102, MCA, and Assault with Bodily Fluid, a misdemeanor, in violation of § 45-5-214, MCA. Randi Hood and Jeremy Gersovitz of the Lewis and Clark County Public Defender Office were appointed to represent Deschon. Deschon filed a Notice of Intent to Rely on the Defense of Justifiable Use of Force and on the morning of trial, he pled guilty to Assault with Bodily Fluid.

¶11 A jury trial was held on the offense of deliberate homicide. Deschon requested individual voir dire because of adverse pretrial publicity which included inadmissible information about Deschon's previous criminal history. The court reporter did not report the voir dire proceedings, however. According to the jury list, neither party moved to excuse any individual juror for cause and the parties' peremptory challenges were recorded and a final jury was selected.

¶12 During trial, the defense called William Lawrence to testify in support of Deschon's affirmative defense of justifiable use of force. Gersovitz, one of Deschon's attorneys, was

also representing Lawrence on pending charges for felony domestic abuse. The night before the trial began, a deputy county attorney met with Lawrence at the Lewis and Clark County Jail regarding his testimony at the Deschon trial. Gersovitz was not present at this meeting. Lawrence later told Gersovitz that he felt intimidated by the county attorney and was afraid that his testimony would have a negative effect on the plea negotiations in his own case. Lawrence testified at trial that he met Azure at a bar on the evening of the fight, and Azure told him he had "just got done kicking the shit out of [Deschon]."

¶13 The jury returned with a verdict finding Deschon guilty of deliberate homicide. The District Court sentenced Deschon to the Montana State Prison for fifty years with ten years suspended for the offense of deliberate homicide, an additional five years for the use of a weapon, and one year for the offense of Assault with Bodily Fluids. This appeal followed.

¶14 Was Deschon denied effective assistance of counsel because his counsel had a conflict of interest that adversely affected his performance?

¶15 Deschon argues that his counsel, Gersovitz, represented competing interests by representing Lawrence, a key defense witness, while Deschon's trial was in progress. He points out that while representing Deschon, Gersovitz was also representing Lawrence and engaging in plea negotiations with the State on Lawrence's behalf. He emphasizes that Gersovitz informed the court that he represented Lawrence on an unrelated matter and noted that the county attorney had interviewed Lawrence and that Lawrence "clearly felt intimidated," and was worried that his testimony in the Deschon trial would have a negative effect on the outcome of his own case. Deschon argues that Lawrence's testimony was essential to his affirmative defense of justifiable use of force and that Gersovitz's simultaneous representation caused a conflict because he was required to present a complete defense for Deschon and at the same time protect Lawrence from potential negative consequences of testifying in the Deschon trial. Deschon argues that because of the conflict, Gersovitz did not examine Lawrence fully and that, as a result, Lawrence's credibility was diminished. Specifically, Deschon claims that Gersovitz should have questioned Lawrence on the stand about feeling intimidated by his discussion with the county attorney, and he argues that Gersovitz did not pursue that line of questioning in order to protect Lawrence.

¶16 The State argues that Deschon and Lawrence did not have competing interests, and that, even assuming a conflict existed, it did not adversely affect Gersovitz's performance.

The State points out that Deschon and Lawrence were not co-defendants, Lawrence was in no way implicated in the crime Deschon was accused of and had no personal stake in the outcome of the trial. Additionally, any fear of reprisal Lawrence may have harbored did not affect his testimony. Lawrence took the stand and told the jury that Azure confided in him that he had already "kicked [Deschon's] ass" once that night and was prepared to do it again. The State claims that testimony concerning Lawrence's feeling intimidated by the county attorney would have been irrelevant and inadmissible.

¶17 The Sixth Amendment to the United States Constitution and Article II, Section 24 of the Montana Constitution guarantee a criminal defendant the right to the assistance of counsel. Mere representation by counsel is not sufficient, however; the assistance must be effective to give true meaning to that right. *State v. Jones* (1996), 278 Mont. 121, 125, 923 P.2d 560, 562. The constitutional right to effective assistance of counsel is comprised of two correlative rights: the right to counsel of reasonable competence and the right to counsel's undivided loyalty. *Jones*, 278 Mont. at 125, 923 P.2d at 562. The Sixth Amendment contemplates the assistance of an attorney devoted solely to the interests of his client and this duty is perhaps the most basic of counsel's duties. *Jones*, 278 Mont. at 125, 923 P.2d at 562-63.

¶18 A defendant claiming ineffective assistance of counsel due to a conflict of interest must show: (1) that counsel actively represented conflicting interests; and (2) that an actual conflict of interest adversely affected counsel's performance. *State v. Christenson* (1991), 250 Mont. 351, 355, 820 P.2d 1303, 1306 (citing *Cuyler v. Sullivan* (1980), 446 U. S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333, 348). An actual conflict, as opposed to the mere possibility of a conflict, is necessary. Such conflict must be proved through a factual showing on the record. *Sanders v. Ratelle* (9th Cir. 1994), 21 F.3d 1446, 1452. A defense attorney has an actual conflict when he is required to make a choice advancing another client's interests to the detriment of his client's interest. *United States v. Gantt* (D. C. Cir. 1998), 140 F.3d 249, 254 (quoting *United States v. Bruce* (D.C. Cir. 1996), 89 F.3d 886, 893).

¶19 In this case, there is nothing in the record to indicate that Lawrence considered not testifying in the Deschon trial or that Lawrence asked Gersovitz to advise him whether he should testify. Even if Lawrence had different counsel, he would still have been in the position of testifying in one criminal trial while negotiating a plea in another. Lawrence did, in fact, testify and his testimony did, in fact, support Deschon's defense that Azure was the aggressor.

¶20 Even assuming *arguendo* that an actual conflict of interest existed, Deschon cannot establish that the conflict adversely affected Gersovitz's performance. Nothing in the record suggests that Gersovitz's method of examination was in any way motivated by a desire to protect Lawrence's interests at Deschon's expense. Lawrence testified that Azure was in a foul mood, that Azure told him he had already "kicked [Deschon's] ass" and was prepared to do it again. Lawrence provided all the facts within his personal knowledge to support Deschon's defense.

¶21 We conclude that Gersovitz's performance was not adversely affected by an actual conflict of interest and, therefore, Deschon was not denied effective assistance of counsel.

¶22 Was Deschon's right to due process violated because no transcript of voir dire exists for review on appeal?

¶23 Deschon argues that his right to a meaningful appeal was violated because he has tenable appellate theories that cannot be determined without a record of the voir dire and that there is no alternative to a transcript available. Deschon points out that there was adverse media publicity before his trial which included inadmissible information about his previous criminal history. The record is silent as to whether any jurors were prejudiced by the article, and Deschon claims, therefore, that his fundamental right to an impartial jury is implicated. Deschon does not claim specifically that any of the jurors were prejudiced by the pretrial publicity, but he does imply that he was prevented from including affidavits with more specific allegations because this Court strictly enforces the rule preventing introduction of new, non-record material on appeal.

¶24 The State counters that the Rules of Appellate Procedure specifically provide a procedure where parties can submit their versions of unrecorded portions of the record to the district court and the court can then generate a written summary to be included in the record on appeal. Rule 9(d), M.R.App.P. The State argues that Deschon made no effort to re-create the circumstances of voir dire by interviewing his trial counsel or the clerk of court. Because Deschon chose to do nothing, he cannot now claim that the lack of record is reversible error.

¶25 We have stated that a trial court should order its court reporter to record the voir dire examination and that diligent defense counsel should demand that these proceedings be recorded. *State v. Seitzinger* (1979), 180 Mont. 136, 143, 589 P.2d 655, 659.

¶26 The Ninth Circuit has adopted the test from *Britt v. North Carolina* (1971), 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400, to determine when a state court's failure to record portions of a criminal trial violates due process. *Madera v. Risley* (9th Cir. 1989), 885 F.2d 646, 648. Two criteria were identified as relevant to the determination: (1) the value of the transcript to the defendant in connection with the appeal or trial for which it is sought, and (2) the availability of alternative devices that would fulfill the same functions as a transcript. *Madera*, 885 F.2d at 648.

¶27 In *Madera*, the defendant argued that he likely suffered unfair prejudice in connection with his codefendant's failed alibi defense. The Ninth Circuit held that he satisfied the first criterion in the *Britt* test because he identified a tenable theory as to what the error might have involved. However, the Court concluded that Madera had not satisfied the second criterion. The district court had held an evidentiary hearing to reconstruct the unrecorded portions of the trial. The prosecutors and trial attorneys for Madera and his codefendant testified at the hearing. The court noted that the witnesses' memories were exceptional, their testimony was consistent, and part of the testimony was based on notes the attorneys had taken during the trial. *Madera*, 885 F.2d at 648. The court found that the reconstruction was adequate and showed that no impropriety regarding the alibi defense or any other issue was committed during the unrecorded portions of the trial. The Ninth Circuit held the district court finding was not clearly erroneous and that Madera was not prejudiced by the lack of recordation. *Madera*, 885 F.2d at 649.

¶28 In this case, Deschon claims that he needs a record to determine whether any of the jurors were prejudiced by pre-trial publicity. He identifies a tenable theory as to what the error might have involved, therefore he has established the first part of the *Britt* test, the value of the transcript to the defendant.

¶29 We agree with the State that a written summary prepared pursuant to Rule 9(d), M.R. App.P., would constitute a suitable alternative to a written transcript and thus satisfy the second part of the *Britt* test. However, that is not the only alternative. The *Madera* court outlined a number of other alternatives, including the evidentiary hearing that was relied on in that case.

¶30 We conclude that an evidentiary hearing similar to the one relied on in *Madera* is necessary in this case. Witnesses, such as the prosecutor, defense attorney, court reporter and clerk of court, may testify as to their memory of the voir dire proceedings.

¶31 We again admonish district courts and counsel that voir dire proceedings should be recorded to avoid these problems in the future.

¶32 We affirm in part and remand for an evidentiary hearing consistent with this opinion.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ KARLA M. GRAY

/S/ JAMES C. NELSON

/S/ JIM REGNIER

/S/ TERRY N. TRIEWEILER

/S/ PATRICIA COTTER

/S/ JIM RICE