No. 02-322

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 32

STATE OF MONTANA,

   Plaintiff and Respondent,

  v.

JOSEPH LESTER DESCHON,

   Defendant and Appellant.

APPEAL FROM: District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. CDC 1999-233,
Honorable Thomas C. Honzel, Presiding Judge

COUNSEL OF RECORD:

   For Appellant:

    Chad Wright, Appellate Defender, Helena, Montana

   For Respondent:

    Honorable Mike McGrath, Attorney General; Tammy K. Plubell,
Assistant Attorney General, Helena, Montana

    Leo Gallagher, County Attorney; Mike Menahan, Deputy County
Attorney, Helena, Montana

Submitted on Briefs: December 27, 2002

Decided: February 18, 2004

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Joseph Lester Deschon (Deschon) appeals from his conviction and sentence for the offense of deliberate homicide, with enhancement for the use of a dangerous weapon, and from an evidentiary hearing on remand. We affirm.

¶2 Deschon raises the following issues on appeal:

¶3 1. Was the evidentiary hearing held for the purpose of reconstructing the unrecorded voir dire portions of Deschon's trial sufficient to preserve his right to due process?

¶4 2. Did Deschon's trial counsel provide ineffective assistance of counsel during voir dire?

**FACTUAL AND PROCEDURAL BACKGROUND**

¶5 On November 19, 1999, the State of Montana charged Deschon with deliberate homicide, a felony, in violation of § 45-5-102, MCA, for the stabbing death of his nephew; and assault with bodily fluid, a misdemeanor, in violation of § 45-5-214, MCA, for spitting on the arresting officers. Deschon pled guilty to the assault charge, and on January 20, 2000, following a three-day trial, the jury returned a verdict finding Deschon guilty of deliberate homicide. On March 16, 2000, the District Court sentenced Deschon to the Montana State Prison for fifty years with ten years suspended for the offense of deliberate homicide, an additional five years for the use of a weapon, and one year for the offense of assault with bodily fluids.

¶6 On April 6, 2000, Deschon appealed his conviction of deliberate homicide arguing, *inter alia*, that his right to due process was violated because no transcript of the voir dire portion of the trial existed, thus depriving him of the right to a meaningful appeal. The voir

2

dire was not recorded because of the then common, and now discarded, practice of waiving the recording of voir dire when the parties agreed it was likely there would be no issues during the jury selection process. On January 30, 2002, this Court remanded for an evidentiary hearing for the purpose of reconstructing the unrecorded voir dire portions of Deschon's trial. *See State v. Deschon*,[1] 2002 MT 16, ¶ 32, 308 Mont. 175, ¶ 32, 40 P.3d 391, ¶ 32.

¶7 On April 9, 2002, the District Court conducted the evidentiary hearing and received testimony from two trial jurors, the four attorneys involved in the voir dire process, and Deschon. Additionally, a number of exhibits were entered, including trial notes taken by the attorneys and Deschon during voir dire. The District Court ordered that a transcript of the hearing be prepared and that the file be returned to the Montana Supreme Court. Deschon appeals from the judgment, conviction and sentence, and from the evidentiary hearing.

## DISCUSSION

### Issue 1

**¶8 Was the evidentiary hearing held for the purpose of reconstructing the unrecorded voir dire portions of Deschon's trial sufficient to preserve his right to due process?**

¶9 In his first appellate brief, Deschon challenged his conviction for deliberate homicide in part on the denial of a meaningful appellate review caused by the lack of any record of the voir dire proceedings. *Deschon I*, ¶ 23. According to Deschon, this violated his right to due

---

[1] *State v. Deschon*, 2002 MT 16, 308 Mont. 175, 40 P.3d 391, shall be referred to as *Deschon I* for purposes of discussing the facts and procedural background leading up to the issues addressed in this opinion.

process under the Fifth and Fourteenth Amendments to the United States Constitution and Article II, Section 17 of the Montana Constitution. Deschon contended that adverse media publicity existed prior to his trial, and, since the record was silent as to whether any jurors were prejudiced by the publicity, his fundamental right to an impartial jury was therefore implicated.

¶10    In *Deschon I*, this Court applied the two-part test for determining whether Deschon's right to due process had been violated established by the United States Supreme Court in *Britt v. North Carolina* (1971), 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400, and subsequently followed by the Ninth Circuit in *Madera v. Risley* (9th Cir. 1989), 885 F.2d 646, 648; *Deschon I*, ¶ 26. The two criteria for this determination are: (1) the value of the transcript to the defendant in connection with the appeal or trial for which it is sought, and (2) the availability of alternative devices that would fulfill the same functions as a transcript.

¶11    This Court concluded that Deschon had identified a tenable theory as to possible error, specifically, that the jurors were not impartial as a result of adverse pretrial publicity, thus satisfying the first part of the *Britt* test. *Deschon I*, ¶ 28. This Court further concluded that an evidentiary hearing would serve as an alternative to a verbatim transcript, thus satisfying the second part of the *Britt* test:

> We conclude that an evidentiary hearing similar to the one relied on in *Madera* is necessary in this case. Witnesses, such as the prosecutor, defense attorney, court reporter and clerk of court, may testify as to their memory of the voir dire proceedings.

*Deschon I*, ¶ 30.

4

¶12	After the evidentiary hearing was conducted on remand to reconstruct the voir dire record, Deschon continued his appeal from the judgment, and now asserts in his second appellate brief that the hearing was insufficient to provide the needed information to determine whether any of the jurors were biased. In addition to his prior contention that a verbatim transcript was needed to determine whether jurors were biased because of pretrial publicity, Deschon now raises several additional theories of potential juror bias, namely, bias as a result of Deschon's failure to testify, prior knowledge of Deschon, and Deschon's race. Deschon argues that without a verbatim transcript, none of these potential biases can be verified, and, therefore, this Court should reverse and remand for a new trial.

¶13	Though we have admonished trial courts to order the recording of voir dire examinations, it is well established that the lack of a verbatim transcript is not a constitutional defect when a suitable alternative is provided. *See Mayer v. City of Chicago* (1971), 404 U.S. 189, 194, 92 S.Ct. 410, 414-15, 30 L.Ed.2d 372 (a "record of sufficient completeness" does not translate automatically into a complete verbatim transcript; the state may find other means of affording adequate and effective appellate review); *see also Harris v. Estelle* (5th Cir. 1978), 583 F.2d 775, 777. "A reconstructed record, as opposed to a verbatim transcript, can afford effective appellate review, particularly where appellate rules have established a procedure for reconstruction of the trial record." *U.S. v. Cashwell* (11th Cir. 1992), 950 F.2d 699, 703; *see also Morgan v. Massey* (5th Cir. 1976), 526 F.2d 347, 348. Rule 10(e), F.R.App.P., has provided such a procedure in a number of instances where reconstruction of the trial record was necessary. *See e.g. Cashwell*, 950 F.2d at 704; *U. S.*

5

*v. Preciado-Cordobas* (11th Cir. 1993), 981 F.2d 1206, 1210; *U.S. v. Novaton* (11th Cir. 2001), 271 F.3d 968, 993.

¶14    In *Cashwell*, the defendant argued that his conviction must be vacated due to the unavailability of a transcript of the voir dire and the inability of the court to adequately reconstruct those proceedings. He asserted that, as a result of this void, he was denied a meaningful appeal and thus deprived of his right to due process. However, the appellate court held that "the district court's failure to require the recording of the voir dire proceedings will mandate a reversal only if the absence of this proceeding is a substantial and significant omission from the record which cannot be adequately reconstructed." *Cashwell*, 950 F.2d at 704. After a reconstruction hearing was held pursuant to Rule 10(e), F.R.App.P., the appellate court determined that, taken together, "the testimony, recollections, and relevant jury selection records . . . present[ed] a fair and accurate picture of what transpired during that phase of the trial." *Cashwell*, 950 F.2d at 704. The court concluded that the reconstructed record was adequate for the defendant to challenge the venire on appeal. *Cashwell*, 950 F.2d at 704.

¶15    Similarly, in *U.S. v. Preciado-Cordobas I* (11th Cir. 1991), 923 F.2d 159, the defendants moved for a new trial on grounds they could not effectively appeal their convictions due to the unavailability of a transcript of counsels' closing arguments. The appellate court remanded the case pursuant to Rule 10(e), F.R.App.P., directing the district court to attempt to reconstruct the closing arguments. The appellate court advised the district court judge that in attempting to reconstruct the record, he may use "his notes, the [court]

6

reporter's notes, and, of course, the testimony of witnesses, including the appellant[s'] trial attorney[s]." *Preciado-Cordobas I*, 923 F.2d at 160-61. Subsequently, upon review of the trial court's reconstruction of the closing arguments, the appellate court concluded that the reconstruction was sufficient, noting that "[w]hile there may have been flaws in the trial, it strains the imagination to conceive reversible error from all that we know of the trial from the actual transcript of the evidence and the reconstructed arguments before the jury." *Preciado-Cordobas*, 981 F.2d at 1214.

¶16 Rule 9(f), M.R.App.P., modeled after Rule 10(e), F.R.App.P., provides the same procedure under Montana law for reconstruction of the trial record:

> **(f) Correction or modification of the record.** If any difference arises as to whether the record truly discloses what occurred in the district court, the difference shall be submitted to and settled by that court and the record made to conform to the truth. If anything material to either party is omitted from the record by error or accident or is misstated therein, the parties by stipulation, or the district court, either before or after the record is transmitted to the supreme court, on proper suggestion or of its own initiative, may direct that the omission or misstatement be corrected, and if necessary that a supplemental record be certified and transmitted. All other questions as to the form and content of the record shall be presented to the supreme court.

Thus, omissions from the verbatim transcript do not mandate a reversal if a suitable alternative method of reporting trial proceedings is provided, or the record can be adequately reconstructed to accord effective appellate review. Whether a reconstructed record is of sufficient completeness to accord effective appellate review is a question which may be determined by this Court. Rule 9(f), M.R.App.P. Thus, we now analyze the sufficiency of the reconstruction hearing to review Deschon's issues on appeal. Testimony at the hearing was received from Brian Gustafson (Gustafson) and Henry Elbrecht (Elbrecht), two jurors

7

who served on Deschon's jury panel; Mike McGrath (McGrath), and Mike Menahan (Menahan), county attorney and deputy county attorney with the Lewis and Clark County Attorney's Office; Randi Hood (Hood) and Jeremy Gersovitz (Gersovitz), Deschon's public defenders; and Deschon.

¶17 First, regarding pretrial publicity, Deschon contends that a number of the jurors who served on the panel had seen or heard media accounts of the case, but that Hood did not conduct individual voir dire in chambers to explore the extent of the jurors' prior knowledge. As Deschon correctly asserts, trial notes which Gersovitz took during voir dire indicate that ten prospective jurors had read newspaper accounts or heard news reports.

¶18 At the hearing, Hood opined that, although there had been some publicity surrounding the homicide, it was neither "excessive" nor "inflammatory," and it certainly did not warrant a change in venue. McGrath testified that the prospective jury panel responded that they did not remember anything specific about the case from the publicity, and that "no juror had significant prior information." Further hearing testimony reveals that not only did McGrath and Hood both question the panelists as to whether they had any recollection about the case from pretrial publicity, and to what extent, but both attorneys additionally offered a "catchall" question at the end of their voir dire questioning asking the panel if they were biased or prejudiced in any way. No one responded affirmatively.

¶19 Hood also explained that she had filed a motion to conduct individual voir dire if necessary because Deschon was charged with homicide, and his charge had received some media attention. Although Deschon asserts that Hood's failure to question any juror in

8

chambers raises the possibility of bias which can only be addressed by a verbatim transcript, hearing testimony reveals the attorneys had an understanding that if any of the jurors indicated that they had knowledge about the case, then individual voir dire would be conducted with that juror. McGrath, Menahan, and Hood all testified that no limits had been imposed as to when Hood could ask for in-chamber voir dire. However, both Hood and McGrath testified that their recollection of the voir dire responses was that individual voir dire was not necessary for any of the jurors. Hood testified that no one made a statement that raised enough concern for her to believe that "they might pollute the jury."

¶20    Although the reconstruction proceeding did not create a verbatim account of the voir dire proceedings, we conclude that the hearing testimony established a fair and accurate picture of what transpired which was sufficiently complete to accord review of Deschon's issues on appeal. As this Court stated in *Great Falls Tribune v. District Court* (1980), 186 Mont. 433, 608 P.2d 116:

> [i]n the modern world it is impossible to create an artificial, antiseptic environment from which prospective jurors may be drawn who have heard nothing of a serious crime committed in their midst. People read newspapers. They listen to radio and television newscasts. It is only where they form fixed opinions on the guilt or innocence of the defendant which they would not be able to lay aside and render a verdict based solely on the evidence presented in court that they become disqualified as jurors.

*Great Falls Tribune*, 186 Mont. at 439, 608 P.2d at 120. The reconstruction of the voir dire in Deschon's trial was sufficiently complete to allow a determination of whether pretrial publicity had created a bias among jurors which would interfere with their ability to act

9

solely on the evidence. Nonetheless, Deschon has failed to demonstrate that any juror bias existed.

¶21 As noted above, Deschon has also raised additional claims of potential juror bias in his second appellate brief. The State urges us to decline further consideration of these issues, noting that Deschon's initial demand for a transcript was premised solely on his claim of pretrial publicity, and that his new claims are beyond the scope of our remand.

¶22 It cannot be denied that Deschon's appeal efforts were, at a minimum, inconvenienced by the lack of a voir dire transcript, a problem we have sought to remedy by ordering a reconstruction hearing. Further, Deschon's appellate counsel did not participate in the trial, and thus, did not have independent recollection about voir dire upon which to draw when initially framing Deschon's issues for appeal. There is no apparent authority, and the State cites none, regarding issues which may be permissibly raised within this unique situation. We note that Deschon's new claims are tangentially related to his initial claim: all address the existence of potential juror bias. Therefore, we deem it appropriate to address Deschon's other jury bias claims.

¶23 Deschon asserts that several negative responses from prospective jurors on the issue of his right to remain silent necessitate reversal for lack of a verbatim transcript. According to Deschon, Hood had a duty not only to "educate" the jury on a defendant's right to remain silent, but also to identify and eliminate those jurors who would impose upon Deschon a requirement to tell his side of the story.

¶24 In particular, Deschon contends Juror Gustafson should have been eliminated from the panel because of his bias against Deschon's failure to testify. During the reconstruction

hearing, Mr. Gustafson testified that during voir dire, when he was initially asked whether he would perceive the defendant to be guilty if he did not take the stand in defense of himself, he had spontaneously responded "yes." Hood testified, however, that after spending some time with the entire jury educating them about the reasons why a defendant may choose not to testify, she recalled the following exchange with Mr. Gustafson:

> "So do you think that there might be some good reasons why a defendant wouldn't testify?" . . . And he said yes . . . and I said, "Even if you were innocent?" And he said, "Yes."

Menahan testified that Hood had followed up on this line of questioning, going one juror to the next, and that she ultimately received the assurances of all the jurors who initially had expressed difficulty with a defendant's silence, specifically, that they would abide by an instruction that they not hold a failure to testify against the defendant. As to Gustafson in particular, Hood testified that "[w]hen I was done with him on that issue, I thought that he was still somebody who could be a good juror." During the hearing, Deschon's appellate counsel proposed a hypothetical to Hood that if Mr. Gustafson, instead of acknowledging that there were legitimate reasons for a defendant not to testify, had responded, "I would convict," would she have let it pass. Hood replied, "absolutely not." Gersovitz testified he had no recollection that Mr. Gustafson had said that he would convict if Deschon did not take the witness stand. The notes taken by Deschon during voir dire listed the names of several jurors he did not want to serve on the jury, but Gustafson's name was not among them.

¶25 Deschon also challenges the impartiality of Juror Elbrecht because he had heard of Joe Deschon's name prior to trial, and argues that the reconstruction hearing did not clarify

11

what follow-up, if any, Hood conducted with him. Elbrecht testified that although he had heard Deschon's name, he did not know Deschon or his reputation.

¶26 Elbrecht testified that his brother-in-law was Curt McAlpin, the animal control officer. Deschon testified that he went to school with McAlpin and had a school yard physical altercation with him that resulted in Deschon kicking McAlpin in the groin and hitting him several times on the head. Although Deschon argues that "no competent attorney would keep a juror whose brother had a violent altercation with the attorney's own client," a review of the record reveals that it was Deschon, not Elbrecht, who was aware of the altercation and revealed it, not during the trial, but during the reconstruction hearing. Moreover, Deschon did not testify that he told his trial counsel about the altercation with McAlpin. When questioned on this point, Deschon stated he did not know if Elbrecht would have known about a school yard fight he had with Elbrecht's brother-in-law many years before. Hearing testimony revealed that when the attorneys questioned Elbrecht during voir dire, Elbrecht expressed a belief that he could be a fair and impartial juror.

¶27 Deschon also argues that the reconstruction hearing confirms that the memories of the attorneys involved in the voir dire process were "incomplete, conflicting, and flat out wrong." In support of this assertion he recounts numerous responses by the attorneys to questions regarding who actually challenged certain jurors on the panel for cause. While it is true that McGrath, Menahan, Hood, and Gersovitz either did not agree, or could not specifically recollect, who challenged certain jurors for cause, the record reveals that all of the attorneys recollected that Jurors Zelenka, Price, Montanye, and O'Toole were challenged

12

for cause, and the specific reason for each challenge. Both McGrath and Hood also recalled that there were no objections to any of these challenges for cause.

¶28     Finally, Deschon notes that although he was a Native American defendant facing charges in a predominantly white community, Hood did not ask any questions regarding the jurors' attitudes about Native Americans, which requires reversal of his conviction by this Court because of the absence of a verbatim transcript. However, Hood testified that she intentionally did not question prospective jurors about racial prejudices because Deschon did not look Native American. As the State correctly notes, a verbatim transcript would only reflect what Hood had already established: the Native American issue was one she had strategically avoided during voir dire.

¶29     Consequently, on the additional juror bias issues raised by Deschon, we conclude that, while the reconstruction proceeding did not result in a verbatim account of the voir dire proceedings, the testimony nonetheless presents a "fair and accurate picture of what transpired during that phase of the trial." *Cashwell*, 950 F.2d at 704. As in *Cashwell* and *Preciado-Cordobas*, we determine that, taken as a whole, the combined testimony from the jurors, attorneys, and Deschon, together with the trial notes in exhibit, create a record of sufficient completeness to assure that Deschon's right to due process was not violated. Deschon was presented with the full opportunity to develop and prove his claims of bias as a result of pretrial publicity, the right to remain silent, prior knowledge of Deschon, and Deschon's race, but he wholly failed to do so. The attorneys presented consistent testimony on all of the critical contentions raised in Deschon's first and second appellate briefs. We

13

conclude, therefore, that in this instance, the reconstruction hearing comprised an adequate alternative to the verbatim voir dire transcript, thus satisfying the second part of the *Britt* test.

## Issue 2

**¶30    Did Deschon's trial counsel provide ineffective assistance of counsel during voir dire?**

## Standard of Review

¶31    In considering ineffective assistance of counsel claims on direct appeal, we apply the two-pronged test set forth by the United States Supreme Court in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. St. John*, 2001 MT 1, ¶ 37, 304 Mont. 47, ¶ 37, 15 P.3d 970, ¶ 37 (overruled on other grounds).  Under the first prong, the defendant bears the burden of showing that counsel's performance was deficient or fell below an objective standard of reasonableness.  *St. John*, ¶ 37.  In so doing, the defendant must overcome a strong presumption that counsel's defense strategies and trial tactics fall within a wide range of reasonable and sound professional decisions.  *Strickland*, 466 U.S. at 688-89, 104 S.Ct. at 2064-65, 80 L.Ed.2d at 693; *State v Harris*, 2001 MT 231, ¶ 18, 306 Mont. 525, ¶ 18, 36 P.3d 372, ¶ 18.  The second prong requires the defendant to establish prejudice by demonstrating that there was a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.  *Harris*, ¶ 19.  A defendant claiming ineffective assistance of counsel must ground his or her proof on facts within the record and not on conclusory allegations.  *St. John*, ¶ 38.

¶32    This Court may review an ineffective assistance of counsel claim on direct appeal "when the record . . . fully explain[s] why counsel took, or failed to take, action in providing

a defense for the accused . . . ." *State v. Turnsplenty*, 2003 MT 159, ¶ 17, 316 Mont. 275, ¶ 17, 70 P.3d 1234, ¶ 17.

## Discussion

¶33 Deschon argues that during the voir dire portion of his trial, Hood wasted two of the six peremptory challenges on jurors who should have been challenged for cause, and therefore, his right to a fair trial was infringed. According to Deschon, one peremptory challenge was wasted on Juror Ann Kokoruda, and another was wasted on Juror Daniel Skuletich.

¶34 Deschon contends that Hood should have challenged Juror Kokoruda for cause pursuant to § 46-16-115(2)(e), MCA, because Kokoruda indicated that she had previously served on a jury that convicted a man for homicide–the same charge that Deschon was facing. Section 46-16-115(2)(e), MCA, states:

> **46-16-115. Challenges for cause.** (2) A challenge for cause may be taken for all or any of the following reasons . . .
> (e) having served on a trial jury that tried another person for the offense charged or a related offense.

Deschon argues that since Kokoruda previously served on a jury that considered a deliberate homicide charge, albeit completely unrelated to Deschon's charge, and because Deschon was also charged with deliberate homicide, Hood had a duty to challenge Kokoruda for cause under § 46-16-115(2)(e), MCA. He asserts that no tactical reason exists, other than inexcusable oversight, for Hood's failure to ask follow-up questions when Kokoruda made statements revealing this statutory bias, and failing to challenge her for cause, thus constituting ineffective assistance of counsel.

15

¶35    However, Deschon's interpretation of the statute is incorrect. In *State v. Russell* (1925), 73 Mont. 240, 235 P. 712, the defendant, relying on the statutory predecessor to § 46-16-115(2)(e),[2] argued that the court erred in denying his challenges for cause under the same circumstances as in the instant case: prospective jurors had served as jurors in a case where *another* defendant had been convicted of a *like* offense, there, the offense of rape. This Court affirmed the lower court's denial of his challenges for cause, adopting the general rule that a "juror is not incompetent because he has previously served upon the trial of another defendant charged with a separate and distinct offense, although of the same character . . . ." *Russell*, 73 Mont. at 245, 235 P. at 713 (quoting 35 C.J. 325, § 345). In explaining this rule, the Court also stated the opposite, corollary principle: "As a general rule, however, where the two cases arise out of the same transaction and involve the same issues or are determined by the same evidence, the juror is incompetent." *Russell*, 73 Mont. at 246, 235 P. at 714.

¶36    At the reconstruction hearing, when Deschon's appellate counsel asked Hood why she did not challenge Kokoruda under § 46-16-115(2)(e), MCA, Hood correctly explained that she could not utilize this statute as a basis for challenging Kokoruda for cause because the prior deliberate homicide case for which Kokoruda was a juror occurred in another county and was wholly unrelated to Deschon's charges. For Hood to have been able to challenge Kokoruda for cause under this statute, Kokoruda would have had to have served on a jury trying *the offense* Deschon was charged with, or, in accordance with the post-*Russell*

---

[2] "5. Having served on a trial jury which has tried another person for the offense charged." Section 11960, Revised Codes of 1921.

16

revision to the statute, a related offense to *the offense* Deschon was charged with. Hood testified that because she was still concerned about Kokoruda's propensity to find defendants guilty, and § 46-16-115(2)(e), MCA, was unavailable as a means of challenging her for cause, she exercised a peremptory challenge to remove her from the panel.

¶37 Deschon also faults Hood's failure to challenge Juror Skuletich for cause under § 46-16-115(2)(j), MCA, because of his involvement in law enforcement. Section 46-16-115(2)(j), MCA, provides:

> **46-16-115. Challenges for cause.** (2) A challenge for cause may be taken for all or any of the following reasons . . .
> (j) having a state of mind in reference to the case or to either of the parties that would prevent the juror from acting with entire impartiality and without prejudice to the substantial rights of either party.

Deschon lists several factors tending to indicate Juror Skuletich may not have been able to act impartially. First, Skuletich had a long career in law enforcement as an investigator in the Criminal Investigation Bureau (CIB). Also, Hood was married to the attorney responsible for overseeing the CIB, and, through her husband, knew people who worked for the CIB. Skuletich worked with and knew socially one of the State's witnesses, and Skuletich knew four of the police officers who would testify in Deschon's trial.

¶38 Hood testified that she specifically questioned Skuletich with the hope of challenging him for cause. Hearing testimony reveals that although McGrath and Hood questioned Skuletich extensively about his background as a criminal investigator and his knowledge of some of the State's witnesses, Skuletich consistently responded that he did not work day- to-day with the law enforcement officers involved in Deschon's case, that he did not have close, personal relationships with any of the witnesses, and the fact that a witness was a law

17

enforcement officer would not cause him to place more weight on that person's testimony. Although Deschon suggests that Hood should have conducted individual voir dire with Skuletich, Hood testified she did not know what further questions she could have asked Skuletich to establish a record necessary to challenge him for cause. Hood testified that because she was not personally convinced by Skuletich's seemingly-convincing answers and consistent assurances that he could be impartial, she used a peremptory challenge to remove him from the panel.

¶39 Evidence revealed in the reconstruction hearing fully explains why Hood took the actions she did regarding Jurors Kokoruda and Skuletich. Thus, Deschon's ineffective assistance of counsel claims may be reviewed on direct appeal. *Turnsplenty*, ¶ 17. As set forth in *Strickland*, it then becomes defendant's burden to overcome the strong presumption that counsel's performance falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 688-89, 104 S.Ct. at 2064-65, 80 L.Ed.2d at 693.

¶40 As discussed above, Hood correctly concluded that § 46-16-115(2)(e), MCA, as applied by *Russell,* prohibited her from challenging Juror Kokoruda for cause. Therefore, Deschon has failed to meet his burden of overcoming the presumption that Hood's performance constituted reasonable professional assistance.

¶41 Deschon also failed to meet this burden in his challenge to Hood's actions in regard to Juror Skuletich. This Court has held that § 46-16-115(2)(j), MCA, "does not specifically exclude law enforcement officers from serving as jurors in a criminal case. . . . The bare fact that [a juror] is connected with law enforcement does not, without more, necessitate a finding that he would not be an impartial juror." *State v. Thompson* (1976), 169 Mont. 158,

18

163, 545 P.2d 1070, 1072-73. In light of the juror's consistent responses that he could remain impartial, a challenge for cause could not be sustained, and a peremptory challenge, based upon Hood's subjective feelings, was the only available method of removing Skuletich from the panel. Thus, Hood's conduct did not fall below an objective standard of reasonableness, and Deschon has again failed to establish the first prong of the *Strickland* test. It is unnecessary, then, for this Court to consider the second prong of the *Strickland* test to review Hood's actions in regard to either Juror Kokoruda or Juror Skuletich.

¶42 We thus conclude, as to issue number 1, that the reconstruction of the voir dire portion of Deschon's trial was sufficient to preserve his due process rights. As to issue number 2, Deschon has not met his burden under *Strickland* and *St. John* to prove his ineffective assistance of counsel claims. *Strickland*, 466 U.S. at 688-89, 104 S.Ct. at 2064-65, 80 L.Ed.2d at 693; *St. John*, ¶ 37.

¶43 Affirmed.

/S/ JIM RICE

We Concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ PATRICIA O. COTTER
/S/ JIM REGNIER

19