# IN THE COURT OF APPEALS OF IOWA

No. 23-0124
Filed April 24, 2024

**JASON DWAINE TATE,**
    Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
    Respondent-Appellee.
_____

Appeal from the Iowa District Court for Clinton County, Mark R. Lawson,

Judge.

An applicant appeals the denial of his application for postconviction relief.

**AFFIRMED**.

Alfredo Parrish of Parrish Kruidenier Dunn Gentry Brown Bergmann &

Messamer L.L.P., Des Moines, for appellant.

Brenna Bird, Attorney General, and Nicholas E. Siefert, Assistant Attorney

General, for appellee State.

Considered by Tabor, P.J., and Badding and Chicchelly, JJ.

**BADDING, Judge.**

"Baby, it's not loaded," is what Jason Tate said he told his girlfriend, Kelsey Stahl, before he pulled the trigger on a gun he found in a dumpster. But the gun was loaded, and the bullet hit Stahl in the neck, killing her. At his jury trial for first-degree murder and felon in possession of a firearm, Tate claimed the shooting was accidental. He pled guilty to being a felon in possession of a firearm during the trial and, at the close of evidence, was found guilty of first-degree murder. We affirmed Tate's murder conviction on direct appeal, finding sufficient evidence that he "willfully and deliberately shot Kelsey Stahl with premeditation and malice aforethought, specifically intending to cause her death." *See State v. Tate*, No. 11-1671, 2013 WL 261248, at *6 (Iowa Ct. App. Jan. 24, 2013).

On postconviction relief, Tate claimed his trial counsel was ineffective for failing to (1) adequately communicate a plea offer, (2) sever the felon-in-possession-of-a-firearm charge from the first-degree-murder charge, (3) have his expert firearm witness physically examine the gun used in the shooting, (4) move for a mistrial after a juror was shown on television, and (5) disclose a conflict of interest with a defense witness. The district court denied these claims, and Tate appeals.

We review ineffective-assistance claims de novo. *See Sothman v. State*, 967 N.W.2d 512, 522 (Iowa 2021). To prevail, Tate must prove by a preponderance of the evidence that (1) his counsel failed to perform an essential duty and (2) prejudice resulted. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Lopez*, 907 N.W.2d 112, 116 (Iowa 2018). We "may consider

either the prejudice prong or breach of duty first, and failure to find either one will preclude relief." *State v. Lopez*, 872 N.W.2d 159, 169 (Iowa 2015).

1.  *Plea Offer*

Prior to trial, the State made an offer for Tate to plead guilty to second-degree murder. Tate's lead defense counsel, Eric Puryear, testified at the postconviction hearing that he remembered going to visit Tate at jail to discuss the offer. He was joined by two other attorneys helping with the case. While Puryear had nothing in writing to document the offer, or his advice to Tate, he testified: "I can tell you that I made a ton of jail visits. I don't think I've ever visited a client more in jail than I did Mr. Tate." Puryear was confident that they "discussed all of his options as to all of the charges. There was no—it was a lengthy discussion. There was no shortage of counsel provided." But Puryear testified Tate declined the offer because he never wavered on his claim that the shooting was accidental—"the biggest issue was he just kept coming back to, he's not going to plead to murder. He's not going to—to admit to having killed someone, to being a murderer, essentially."

Tate's memory was different. He testified that while he met with the other two attorneys about the plea offer, he never talked to Puryear about it until a pretrial conference. There, when the judge asked Tate whether he wanted to accept the offer, Tate testified: "I looked at Eric. And he said, 'No.' And I responded, 'No.'" Tate said that had he been given the opportunity, he "would have considered"

taking the offer. As the district court found,[1] that's not enough to establish prejudice in this context.

"[I]n order to prove prejudice, an applicant who previously rejected a plea offer in favor of going to trial 'must show that, but for counsel's advice, he would have accepted the plea.'" *Kirchner v. State*, 756 N.W.2d 202, 205 (Iowa 2008) (citation omitted). "The applicant 'must present some credible, non-conclusory evidence that he would have pled guilty had he been properly advised.'" *Id.* (citation omitted). Tate did not present any evidence like that. Instead, when asked whether he would have accepted the plea offer, Tate would only respond: "I might have." Because the record shows that Tate's decision to reject the plea offer was unrelated to any deficient advice from counsel, but rather his insistence that the shooting was accidental, we find that he has failed to demonstrate the necessary prejudice to succeed with this claim. *See Dempsey v. State*, 860 N.W.2d 860, 869 (Iowa 2015) (holding that "a claimant must proffer more than his or her own subjective, self-serving testimony" to establish prejudice from rejecting a plea offer).

*2.  Severance*

Tate next claims the district court erred in rejecting his claim that trial counsel was ineffective for failing to sever the felon-in-possession-of-a-firearm charge from his first-degree-murder charge. At the postconviction hearing, Puryear testified this was a strategic decision because it "explain[ed] the whole

---

[1] The court also found Puryear's testimony about the meeting more credible than Tate's. *See Sothman*, 967 N.W.2d at 522 (noting appellate courts should give weight to district court's findings on witness credibility).

story." That story, as told by Tate, was summarized in our decision on direct appeal:

> During the trial, Tate testified. He indicated that on the morning of December 19, 2010, he picked up his son from his ex-girlfriend's mother, Jerri Ross. At some point, he and his son drove Stahl to work at the nursing home. He then took his son to a friend's home to play with similarly aged children. While at this home, Tate learned of a .38 caliber gun with a pearl handle that had been placed in a dumpster. Tate then drove his son back to his grandmother's home. Afterwards, Tate drove to Jordan Guy's home. Tate and Guy smoked marijuana and drove to the dumpster to locate the gun. Once Tate found the gun, he offered to sell it to Guy. Guy declined.
>
> Tate testified that on the night of December 19, 2010, he left Guy's house around 7:30 or 8:00 p.m. He then drove to Stahl's apartment. While inside the apartment, Tate asserted that he unloaded the revolver and placed the gun and the bullets into a purple Crown Royal bag. Tate placed the bag in Stahl's bedroom closet. Tate then drove to the nursing home to pick Stahl up from her shift. The two returned to Stahl's apartment.
>
> Tate maintained that once inside the apartment, Stahl requested to see the gun. While showing Stahl the gun, Tate testified that he pulled the trigger to prove to her that it was not loaded. The gun fired a bullet into Stahl, and she dropped to the floor with blood gushing from her neck. Tate claims he panicked, attempted to administer aid, and moved Stahl out of the bedroom. He then threw the gun out of the apartment because, as he explained, he was a felon and not supposed to have a gun.

*Tate*, 2013 WL 261248, at *4–5. After getting rid of the gun, Tate took Stahl's car and fled to an ex-girlfriend's house in Illinois, where he was later apprehended.

Puryear explained:

> If Mr. Tate were not prohibited from possessing a firearm, the entire story about why it is that he ends up in possession of that particular gun, why it is that his gun handling skills and training and safety knowledge are so limited, doesn't come together.
>
> Someone who's not prohibited is in a better position to get training. Someone who's not prohibited doesn't go pick up guns out of, you know—out of trash areas and things like that. And so it—it wouldn't have made sense to the jury. They would have felt something was missing, and that would have been worse.

The record shows that Puryear implemented that strategy at trial, not just to explain Tate's handling of the gun, but also his flight from the scene.

In denying this ineffective-assistance claim, the district court found that "Puryear's decision not to file a motion to sever—while somewhat unusual—was not objectively unreasonable.  Joinder was the rule and severance the exception." *See* Iowa R. Crim. P. 2.6(1).  The court also found counsel "articulated strategic reasons for joinder."  Tate disagrees, arguing that his "flight from the scene of the shooting . . . could be adequately explained by the very reasonable fear engendered by such an accident, with no need to refer to his criminal history," which was "improper and prejudicial."

Although our case law recognizes the "risk of prejudice from informing the jury of the defendant's prior felony conviction when it is not an element of one of the charges, there is no per se rule 'compelling severance whenever the State charges a felon with being in possession of weapons along with other related charges.'"  *Neal v. State*, No. 19-1036, 2021 WL 1400721, at *3 (Iowa Ct. App. Apr. 14, 2021) (quoting *State v. Owens*, 635 N.W.2d 478, 482 (Iowa 2001)).  The court must strike "a proper balance between the antipodal themes of ensuring a defendant a fair trial and preserving judicial efficiency."  *Owens*, 635 N.W.2d at 482 (cleaned up).

As in *Owens*, 635 N.W.2d at 482–83 and *Neal*, 2021 WL 1400721, at *3, where the appellate courts held the proper balance was struck without severance, the jury here was informed of Tate's prior felony conviction in a one-sentence stipulation that did not disclose any details about the felony.  Even though a limiting instruction was not given, *cf. Owens*, 635 N.W.2d at 483, the defense tried to use

Tate's felon status to its advantage in explaining his story about the shooting. While that strategy was unsuccessful, "[i]mprovident trial strategy, miscalculated tactics, or mistakes in judgment do not necessarily amount to ineffective assistance." *Kane v. State*, 436 N.W.2d 624, 627 (Iowa 1989). For these reasons, we agree with the district court that defense counsel did not breach an essential duty by failing to move for severance of the two charges.

*3.     Expert Witness*

The spring after Stahl's death, an employee at her apartment building found the gun that Tate threw out after the shooting. At his criminal trial, Tate presented testimony from Vern Trester, a gunsmith with over forty years of experience. Trester testified that he was familiar with the gun Tate used in the shooting—a Charter Arms .38 special revolver—though he had not physically inspected it. On two recent occasions, despite his experience with guns, Trester thought he had unloaded a Charter Arms only to learn that he hadn't: "I flipped it open, hit the extractor, then flipped it back shut, pulled the trigger. The second time I pulled the trigger, I saw that there was a live round still in there." Trester explained the Charter Arms is

> a small gun. It's short. The crane that holds the cylinder isn't long enough to clear when the gun is open. One round, possibly two, will always hit the grip, so you have to—it's an extractor, not an ejector. It's made to extract the rounds, and I did that carelessly and I could have shot myself.

Tate claims that while Trester was able to testify "that the make and model of [the] .38 involved was *generally* prone to difficulties," because defense counsel did not have Trester physically inspect the gun, he was not "able to provide expert

testimony to show that this *specific* weapon was even more defective than similar models." This claim fails for three reasons on the prejudice prong.

First, Trester testified at trial that he did not physically inspect the gun because the State had already cleaned it. He agreed that "in order for an inspection of a firearm to be valid," it was "necessary to have that firearm in the condition in which it was used." Second, the State's firearm expert, who did physically inspect the gun, agreed with Trester that it was possible for a live round to remain in the chamber with no warning to the user that it was loaded. Third, the firearms expert Tate hired for the postconviction-relief proceedings, who also physically inspected the gun, reached the same conclusions as the other experts: it was possible the weapon could accidentally discharge. Because Tate has not shown a reasonable probability that the result of the proceeding would have been different had Trester physically examined the gun, we reject this claim. *See King v. State*, 797 N.W.2d 565, 574 (Iowa 2011) (finding applicant failed to show a reasonable probability that the verdict would have been different if his expert witness had presented a fuller picture of the DNA evidence at his criminal trial).

*4. Mistrial*

Toward the end of Tate's trial, the court attendant informed the parties that one of the jurors had learned she had been on television "and she was quite upset." The attendant continued:

> Well, the juror that I spoke with, her husband took the information from the friend and then was afraid to tell her that she was on TV and didn't tell her that until like yesterday that, yes, you were, indeed, on the TV. He saw you there as a juror, and she freaked, you know. She says, no, no, no. They're not supposed to be taking our pictures. And that's all the information she told me.

The court banned the offending reporter from the courtroom "because it is clearly a rule that she not show footage of the jurors or their faces." Defense counsel did not ask for anything more to be done. Tate claims that was ineffective assistance, arguing counsel should have moved for a mistrial or asked the court to question the jurors about their exposure to the newscast. The district court rejected this claim, finding Tate had "not demonstrated he suffered any prejudice as a result of this omission." We agree.

While defense counsel only vaguely remembered the incident, he was "satisfied that we had . . . a fair jury that was not in any way prejudiced by whatever happened there." Tate does not explain how the juror learning that she was on television would have produced a biased jury. *See State v. Brown*, No. 14-0066, 2015 WL 2393441, at *5 (Iowa Ct. App. May 20, 2015) ("Furthermore, Brown fails to present any argument as to why, even theoretically or presumptively, the potential jurors' fear of publicity would have produced a biased jury and, consequently, how the incident resulted in prejudice to him."). Instead, his prejudice argument is limited to the conclusory statement that he "was prejudiced as a result of this failure." This is insufficient to warrant relief. *See State v. Tate*, 710 N.W.2d 237, 241 (Iowa 2006) (holding conclusory claims of prejudice cannot satisfy the prejudice component of an ineffective-assistance claim).

*5.     Conflict of Interest*

At the postconviction-relief hearing, Puryear revealed that he had represented a defense witness at Tate's criminal trial—Jordan Guy—on a minor, unrelated charge. Puryear explained:

Mr. Guy had been involved with the gun retrieval from the—from the alley trash area. Despite having gone over with Mr. Tate what exactly happened quite a few times, Mr. Tate concealed Mr. Guy's involvement from me for months. It was only when I was talking, I believe, to Mr. Guy that Mr. Guy finally let slip, by the way, I was there, you know, for all of that.

With Guy's permission, Puryear talked to Tate about what Guy had told him, which corroborated Tate's story about finding the gun in the dumpster the day Stahl died. Puryear almost immediately withdrew from representing Guy but stayed on as Tate's counsel, testifying: "Mr. Tate did not wish for me to withdraw as his attorney, and I did not see any reason that withdraw[al] would be needed." He then called Guy as a witness for Tate.

Tate now claims that because of Puryear's dual representation of him and Guy, he was denied effective assistance of counsel under the Sixth Amendment of the United States Constitution and article I, section 10 of the Iowa Constitution. *See State v. Smitherman*, 733 N.W.2d 341, 346–49 (Iowa 2007) (discussing a defendant's "constitutional rights to conflict-free counsel"). He argues that all he "must show under Iowa's Constitution is that an actual conflict existed," in which case prejudice should be presumed under *State v. Watson*, 620 N.W.2d 233, 238 (Iowa 2000), while under the federal constitution, he "must also show his counsel's performance was adversely affected by the conflict of interest." *See State v. Vaughan*, 859 N.W.2d 492, 499–501 (Iowa 2015) (outlining the evolution of our conflict-of-interest jurisprudence).

In *Watson*, our supreme court defined an "actual conflict" of interest as "a situation conducive to divided loyalties." 620 N.W.2d at 239 (citation omitted); *accord Smitherman*, 733 N.W.2d at 347. Two years later, the United States

Supreme Court clarified that "[a]n 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002). That more restrictive definition was adopted by our supreme court in *Smitherman*, under both the federal and state constitutions, for cases in which the trial court inquired about the conflict. 733 N.W.2d at 347. But the court "left open the question whether Iowa—in applying its own constitution—would" apply the "*Mickens* definition of 'actual conflict' in future cases involving different facts." *Williams v. State*, No. 07-1927, 2009 WL 1492560, at *3 (Iowa Ct. App. May 29, 2009) (citing *Smitherman*, 733 N.W.2d at 347). We decline Tate's request to resolve this question because, as the State asserts, he did not show an actual conflict existed even under the less stringent *Watson* definition. *See id.*

Guy's testimony confirmed Tate's account of what happened the day Stahl was shot. Under Puryear's direct examination, Guy testified that he and Tate were "riding around smoking" marijuana. They drove to a dumpster to look for a gun that Tate's friend had thrown out. Guy testified that Tate found the gun and offered to sell it to him, but Guy declined. This all matched Tate's testimony at trial. At the postconviction-relief hearing, Tate testified that he and Puryear were happy that "Guy was our witness because he could corroborate what I was saying had happened," which he recognized "sound[ed] a little farfetched" without Guy's testimony.

Yet on appeal, Tate claims a conflict existed because by calling Guy as a witness, Puryear elicited "damning testimony about Tate's drug use that day." We

fail to see the conflict here.[2]   *See State v. McKinley*, 860 N.W.2d 874, 880 (Iowa 2015) ("A conflict does not exist just because one party asserts it does."). "[M]ost cases that have discussed conflicts of interest have involved an attorney who has represented a defendant or a prosecution witness in the current prosecution or simultaneous civil litigation." *Pippins v. State*, 661 N.W.2d 544, 548 (Iowa 2003) (citing *Watson*, 620 N.W.2d at 238–39, which found an actual conflict of interest due to defense attorney's simultaneous representation of defendant and a prosecution witness in the same case). "Even in cases of joint representation, a conflict is not necessarily established if the defenses are not inconsistent." *Id.*

As Tate recognized at the postconviction-relief hearing, Guy's testimony helped support his defense. *See State v. Deschon*, 40 P.3d 391, 395 (Mont. 2002) (finding no actual conflict of interest where the testimony of a defense witness, who was represented by the defendant's attorney, supported the defendant's theory that the murder victim was the aggressor in the fight).   He knew that the prosecutor planned to ask about their marijuana use the day Stahl was killed, and he wasn't worried about it: "I used to smoke marijuana every day.  So I, myself, really didn't look at it as a big deal.  And I think [Puryear] wasn't either.  It was more or less that's what happened."  Puryear told the trial court the same thing before Guy testified: "I've discussed this with co-counsel a bit and I can't say that I really would

---

[2] That said, the safer route certainly would have been for counsel to disclose the conflict on the record and secure written waivers from his clients. *See Williams*, 2009 WL 1492560, at *4 (noting "a conflict question such as this must be scrutinized very carefully" and "[t]his could well be a different case if the existing record did not make it clear" why there was no conflict).

have that big of a problem with the State bringing up the marijuana use. I certainly would want to have the option of bringing it up on direct myself."[3]

Still, Tate argues that an "attorney who did not have a relationship with Guy would 1) have either directly worked to assign blame for this reported additional wrongdoing squarely on Guy, or 2) would have possessed the objectivity to not attempt such a delicate balancing act and not called Guy" as a witness. On the latter point, even if Guy had not been called as a witness, the State planned to ask Tate about the marijuana use if he testified at trial—which he did. The testimony about the marijuana, in the context of the almost two-week long trial, was limited. As for assigning the blame for smoking marijuana "squarely on Guy," Tate was not charged with possession of marijuana. He was charged with murder in the first degree, and Guy was in no way implicated in that crime. *Cf. United States v. Elliot*, 463 F.3d 858, 865–66 (9th Cir. 2006) (finding a conflict of interest with simultaneous representation of a defendant charged with cocaine offenses and a defense witness because to represent the defendant adequately, defense counsel "needed to interview, aggressively examine, and possibly place blame on" the witness, who sent the defendant a package containing cocaine). Tate has failed to show how their interests were adverse or how counsel's loyalty was divided.

In sum, we agree with the district court on our de novo review that

---

[3] Puryear made this statement after the State alerted the court that it wanted to revisit its decision granting Tate's motion in limine to exclude the marijuana evidence. This happened right before Guy testified. So we find no merit to Tate's claim that Puryear "utterly failed to prepare for [Guy's] testimony at all and discovered at the same time the jury did that Tate and Guy had used drugs on the day Tate acquired the firearm." We reject that separate assignment of error with no further discussion.

[w]hile Puryear's decision to put Guy on the stand resulted in both favorable and unfavorable testimony, it was consistent with his client's trial strategy. It bolstered Tate's claims that he found the gun, was not familiar with it, wanted to get rid of it, and accident[al]ly discharged it while showing it to Stahl. There is no showing that Puryear attempted to spare Guy from a rigorous cross-examination or attempted to hide—or use—any confidential, unfavorable information on Guy that he possessed. Indeed, Guy admitted to drug use as part of his testimony. Therefore, Tate has failed to establish an actual conflict of interest.

6.     *Cumulative Prejudice*

This leaves us with Tate's claim that the cumulative effect of defense counsel's errors resulted in prejudice. *See State v. Clay*, 824 N.W.2d 488, 501 (Iowa 2012) ("Iowa recognizes the cumulative effect of ineffective assistance of counsel claims when analyzing prejudice under *Strickland*."). Because the record contains overwhelming evidence of guilt, we reject this claim. *See State v. Maxwell*, 743 N.W.2d 185, 197 (Iowa 2008).

Tate admitted that he shot and killed Stahl with a .38 caliber revolver. Even though he testified that it was an accident, the revolver was found with the spent casing in about the 2:00 position. The State's firearms expert testified that likely meant someone pulled the trigger twice. Live rounds of ammunition were scattered on the floor in Stahl's bedroom and hallway, undermining Tate's story that he unloaded the gun and put the bullets into a bag. Tate did not help Stahl after he shot her. Instead, he tried to dispose of the gun. He then changed his bloody pants and left the apartment, locking the door behind him. Tate took Stahl's car and fled the state. He went to his ex-girlfriend's house, telling her that he was "on the run for murder." After his arrest, Tate told a police officer that he was going away for a long time. In Tate's direct appeal, we described this—and other

evidence outlined there—as "substantial inculpatory evidence." *Tate*, 2013 WL 261248, at *7. We reach the same conclusion here. Because of the strength of the evidence showing his guilt, Tate has failed to prove that, but for defense counsel's alleged errors, the result of the proceeding would have been different. *See id.*

For these reasons, we affirm the district court's decision denying Tate's claims of ineffective assistance of counsel.

**AFFIRMED.**